[Sac. No. 7816.   In Bank.   June 21, 1968.]

MARGERY M. DILLON et al., Plaintiffs and Appellants, v. DAVID LUTHER LEGG, Defendant and Respondent.

730

Bradford, Cross, Dahl & Hefner, Archie Hefner and James M. Woodside for Plaintiffs and Appellants.

McGregor, Bullen, Erich & McKone, George Bullen and William C. McKinley for Defendant and Respondent.

TOBRINER, J.—That the courts should allow recovery to a mother who suffers emotional trauma and physical injury from witnessing the infliction of death or injury to her child for which the tortfeasor is liable in negligence would appear to be a compelling proposition. As Prosser points out, ''All ordinary human feelings are in favor of her [the mother's] action against the negligent defendant. If a duty to her requires that she herself be in some recognizable danger, then it has properly been said that when a child is endangered, it is not beyond contemplation that its mother will be somewhere in the vicinity, and will suffer serious shock.'' (Prosser, Law of Torts (3d ed. 1964) p. 353.)

Nevertheless, past American decisions have barred the mother's recovery. Refusing the mother the right to take her case to the jury, these courts ground their position on an alleged absence of a required ''duty'' of due care of the tortfeasor to the mother. Duty, in turn, they state, must express public policy; the imposition of duty here would work disaster because it would invite fraudulent claims and it would involve the courts in the hopeless task of defining the extent of the tortfeasor's liability. In substance, they say, definition of liability being impossible, denial of liability is the only realistic alternative.

We have concluded that neither of the feared dangers

excuses the frustration of the natural justice upon which the mother's claim rests. We shall point out that in the past we have rejected the argument that we should deny recovery upon a legitimate claim because other fraudulent ones may be urged. We shall further explain that the alleged inability to fix definitions for recovery on the different facts of future cases does not justify the denial of recovery on the specific facts of the instant case; in any event, proper guidelines can indicate the extent of liability for such future cases.

In the instant case plaintiff's[1] first cause of action alleged that on or about September 27, 1964, defendant drove his automobile in a southerly direction on Bluegrass Road near its intersection with Clover Lane in the County of Sacramento, and at that time plaintiff's infant daughter, Erin Lee Dillon, lawfully crossed Bluegrass Road. The complaint further alleged that defendant's negligent operation of his vehicle caused it to "collide with the deceased Erin Lee Dillon resulting in injuries to decedent which proximately resulted in her death." (Complaint, p. 3.) Plaintiff, as the mother of the decedent, brought an action for compensation for the loss.

Plaintiff's second cause of action alleged that she, Margery M. Dillon, "was in close proximity to the . . . collision and personally witnessed said collision." She further alleged that "because of the negligence of defendants . . . and as a proximate cause [sic] thereof plaintiff . . . sustained great emotional disturbance and shock and injury to her nervous system" which caused her great physical and mental pain and suffering.

Plaintiff's third cause of action alleged that Cheryl Dillon, another infant daughter, was "in close proximity to the . . . collision and personally witnessed said collision." Because of the negligence, Cheryl Dillon "sustained great emotional disturbance and shock and injury to her nervous system" which caused her great physical and mental pain and suffering.

On December 22, 1965, defendant, after he had filed his answer, moved for judgment on the pleadings, contending that "No cause of action is stated in that allegation that plaintiff sustained emotional distress, fright or shock induced by apprehension of negligently caused danger or injury or the witnessing of negligently caused injury to a third person.

---

[1]For convenience, plaintiff will be used in the singular to denote the mother, although a minor sister is joined as plaintiff.

*Amaya* v. *Home Ice, Fuel & Supply Co.*, 59 Cal.2d 295 [29 Cal.Rptr. 33, 379 P.2d 513] (1963). Even where a child, sister or spouse is the object of the plaintiff's apprehension no cause of action is stated, *supra*, p. 303, *unless the complaint alleges that the plaintiff suffered emotional distress, fright or shock as a result of fear for his own safety. Reed v. Moore*, 156 Cal.App.2d 43 (1957) at page 45 [319 P.2d 80].'' (Italics added.) The court granted a judgment on the pleadings against the mother's count, the second cause of action, and denied it as to the sister's count, the third cause of action. The court, further, dismissed the second cause of action. Margery M. Dillon, the mother, appealed from that judgment.

Thereafter, on January 26, further proceedings took place as to the third cause of action, Cheryl Dillon's claim for emotional trauma from witnessing her sister's death while "watching her sister lawfully cross Bluegrass Road."

Defendant moved for summary judgment on this count. In opposition plaintiff contended that the declaration of one McKinley disclosed that Mrs. Dillon testified at her deposition that when she saw the car rolling over Erin she noted that Cheryl was on the curb, but that the deposition of Cheryl Dillon contradicts such statements. Plaintiff therefore submitted that "Since the declarations filed by defendant are contradictory and the testimony contained in the testimony of Mrs. Dillon does not establish as a matter of law that Cheryl Dillon was not in the zone of danger or had fear for her own safety, plaintiff respectfully submits that the motion must be denied."

The court denied the motion for summary judgment on the third cause as to Cheryl on the ground that the pretrial order precluded it. The trial court apparently sustained the motion for judgment on the pleadings on the second cause as to the mother because she was not within the zone of danger and denied that motion as to the third cause involving Cheryl because of the possibility that she was within such zone of danger or feared for her own safety. Thus we have before us a case that dramatically illustrates the difference in result flowing from the alleged requirement that a plaintiff cannot recover for emotional trauma in witnessing the death of a child or sister unless she also feared for her own safety because she was actually within the zone of physical impact.

The posture of this case differs from that of *Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 298 [29 Cal.Rptr. 33, 379 P.2d 513], which involved ''fright or ner-

vous shock (with consequent bodily illness) induced solely by . . . apprehension of negligently caused danger or injury to a third person'' because the complaint here presents the claim of the emotionally traumatized mother, who admittedly was *not* within the zone of danger, as contrasted with that of the sister, who *may have been* within it. The case thus illustrates the fallacy of the rule that would deny recovery in the one situation and grant it in the other. In the first place, we can hardly justify relief to the sister for trauma which she suffered upon apprehension of the child's death and yet deny it to the mother merely because of a happenstance that the sister was some few yards closer to the accident. The instant case exposes the hopeless artificiality of the zone-of-danger rule. In the second place, to rest upon the zone-of-danger rule when we have rejected the impact rule becomes even less defensible. We have, indeed, held that impact is not necessary for recovery (*Cook* v. *Maier* (1939) 33 Cal.App.2d 581, 584 [92 P.2d 434]). The zone-of-danger concept must, then, inevitably collapse because the only reason for the requirement of presence in that zone lies in the fact that one within it will fear the danger of *impact*. At the threshold, then, we point to the incongruity of the rules upon which any rejection of plaintiff's recovery must rest.

We further note, at the outset, that defendant has interposed the defense that the contributory negligence of the mother, the sister, and the child contributed to the accident. If any such defense is sustained and defendant found not liable for the death of the child because of the contributory negligence of the mother, sister or child, we do not believe that the mother or sister should recover for the emotional trauma which they allegedly suffered. In the absence of the primary liability of the tortfeasor for the death of the child, we see no ground for an independent and secondary liability for claims for injuries by third parties. The basis for such claims must be the adjudicated liability and fault of defendant; that liability and fault must be the foundation for the tortfeasor's duty of due care to third parties who, as a consequence of such negligence, sustain emotional trauma.

We turn then to an analysis of the concept of duty, which, as we have stated, has furnished the ground for the rejection of such claims as the instant one. Normally the simple facts of plaintiff's complaint would establish a cause of action: the complaint alleges that defendant drove his car (1) negligently, as a (2) proximate result of which plaintiff suffered

(3) physical injury. Proof of these facts to a jury leads to recovery in damages; indeed, such a showing represents a classic example of the type of accident with which the law of negligence has been designed to deal.

The assertion that liability must nevertheless be denied because defendant bears no "duty" to plaintiff "begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. . . . It [duty] is a shorthand statement of a conclusion, rather than an aid to analysis in itself. . . . But it should be recognized that 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." (Prosser, Law of Torts, *supra,* at pp. 332-333.)

The history of the concept of duty in itself discloses that it is not an old and deep-rooted doctrine but a legal device of the latter half of the nineteenth century designed to curtail the feared propensities of juries toward liberal awards. "It must not be forgotten that 'duty' got into our law for the very purpose of combatting what was then feared to be a dangerous delusion (perhaps especially prevalent among juries imbued with popular notions of fairness untempered by paramount judicial policy), viz., that the law might countenance legal redress for all foreseeable harm." (Fleming, An Introduction to the Law of Torts (1967) p. 47.)

Indeed, the idea of court-imposed restrictions on recovery by means of the concept of "duty" contrasted dramatically with the preceding legal system of feudal society.[2] In the enclosed feudal society, the actor bore responsibility for any damage he inflicted without regard to whether he was at fault or owed a "duty" to the injured person. Thus, at that time, the defendant owed a duty to all the world to conduct himself

---

[2] "The gradual development of the law in the matter of civil liability is discussed and traced by the late Sir William Holdsworth with ample learning and lucidity in his History of English Law, vol. 8, pp. 446 et seq., and need not here be rehearsed. Suffice it to say that the process of evolution has been from the principle that every man acts at his peril and is liable for all the consequences of his acts to the principle that a man's freedom of action is subject only to the obligation not to infringe any duty of care which he owes to others. The emphasis formerly was on the injury sustained and the question was whether the case fell within one of the accepted classes of common law actions; the emphasis now is on the conduct of the person whose act has occasioned the injury and the question is whether it can be characterized as negligent." (*Read* v. *J. Lyons & Co., Ltd.* (1947) A.C. 156, 171.)

without causing injury to his fellows. It may well be that the physical contraction of the feudal society imposed an imperative for maximum procurable safety and a corresponding absolute responsibility upon its members.

The Industrial Revolution, which cracked the solidity of the feudal society and opened up wide and new areas of expansion, changed the legal concepts. Just as the new competitiveness in the economic sphere figuratively broke out of the walls of the feudal community, so it broke through the rule of strict liability. In the place of strict liability it introduced the theory that an action for negligence would lie only if the defendant breached a duty which he owed to plaintiff. As Lord Esher said in *Le Lievre* v. *Gould* (1893) 1 Q.B. 491, 497: ''A man is entitled to be as negligent as he pleases towards the whole world if he owes no duty to them.''

We have pointed out that this late 19th century concept of duty, as applied to the instant situation, has led the courts to deny liability. We have noted that this negation of duty emanates from the twin fears that courts will be flooded with an onslaught of (1) fraudulent and (2) indefinable claims. We shall point out why we think neither fear justified.

1. *This court in the past has rejected the argument that we must deny recovery upon a legitimate claim because other fraudulent ones may be urged.*

The denial of ''duty'' in the instant situation rests upon the prime hypothesis that allowance of such an action would lead to successful assertion of fraudulent claims. (See, e.g., *Waube* v. *Warrington* (1935) 216 Wis. 603, 613 [258 N.W. 497].) The rationale apparently assumes that juries, confronted by irreconcilable expert medical testimony, will be unable to distinguish the deceitful from the bona fide. The argument concludes that only a per se rule denying the entire class of claims that potentially raises this administrative problem[3] can avoid this danger.

In the first instance, the argument proceeds from a doubtful factual assumption. Whatever the possibilities of fraudulent claims of physical injury by disinterested spectators of an accident, a question not in issue in this case, we certainly

---

[3]To the extent that this argument shades into the contention that such claims should be denied because otherwise courts would experience a ''flood of litigation,'' we point out that courts are responsible for dealing with cases on their merits, whether there be few suits or many; the existence of a multitude of claims merely shows society's pressing need for legal redress.

cannot doubt that a mother who sees her child killed will suffer physical injury from shock. "It seems sufficiently obvious that the shock of a mother at danger or harm to her child may be both a real and a serious injury." (Prosser, Law of Torts, *supra,* at p. 353.)

Over a half-century ago this court recognized the likelihood that such fright and fear would cause physical injury. In *Sloane* v. *Southern California Ry. Co.* (1896) 111 Cal. 668, 680 [44 P. 320, 32 L.R.A. 193], we affirmed a judgment for damages for a plaintiff who alleged physical injury resulting from mental suffering, saying: "It is a matter of general knowledge that an attack of sudden fright or an exposure to imminent peril has produced in individuals a complete change in their nervous system, and rendered one who was physically strong and vigorous weak and timid." Since no one can seriously question that fear or grief for one's child is as likely to cause physical injury as concern over one's own well-being, rejection of the fraudulent claims contention in *Sloane* clearly applies here.

In the second instance, and more fundamentally, the possibility that fraudulent assertions may prompt recovery in isolated cases does not justify a wholesale rejection of the entire class of claims in which that potentiality arises. The "contention that the rule permitting the maintenance of the action would be impractical to administer . . . is but an argument that the courts are incapable of performing their appointed tasks, a premise which has frequently been rejected." (*Emden* v. *Vitz* (1948) 88 Cal.App.2d 313, 319 [198 P.2d 696].) "[F]ear that unfounded claims may be put forward, and may result in erroneous conclusions of fact, ought not to influence us to impose legal limitations as to the nature of the facts that it is permissible to prove." (*Owens* v. *Liverpool Corp.* (1939) 1 K.B. 394, 400.) "Certainly it is a very questionable position for a court to take, that because of the possibility of encouraging fictitious claims compensation should be denied those who have actually suffered serious injury through the negligence of another." (*Orlo* v. *Connecticut Co.* (1941) 128 Conn. 231, 239 [21 A.2d 402]. See also Goodhart, *The Shock Cases and Area of Risk* (1953) 16 Modern L.Rev. 14, 23; Throckmorton, *Damages for Fright* (1921) 34 Harv.L.Rev. 260, 276.)

On the analogous issue of whether the possibility of collusive fraud in intrafamily tort actions justified a per se rule denying recovery in all such cases, this court held that the

interests of meritorious plaintiffs should prevail over alleged administrative difficulties. Upholding the claim of a minor child in that situation we said: ''The interest of the child in freedom from personal injury caused by the tortious conduct of others is sufficient to outweigh any danger of fraud or collusion. . . . [T]he fact that there may be greater opportunity for fraud or collusion in one class of cases than another does not warrant courts of law in closing the door to all cases of that class. Courts must depend upon the efficacy of the judicial processes to ferret out the meritorious from the fraudulent in particular cases.'' (*Emery* v. *Emery* (1955) 45 Cal.2d 421, 431 [289 P.2d 218]; see also *Klein* v. *Klein,* (1962) 58 Cal.2d 692, 695-696 [26 Cal.Rptr. 102, 376 P.2d 70].)

The possibility that some fraud will escape detection does not justify an abdication of the judicial responsibility to award damages for sound claims: if it is ''to be conceded that our procedural system for the ascertainment of truth is inadequate to defeat fraudulent claims . . . , the result is a virtual acknowledgment that the courts are unable to render justice in respect to them.'' (*Chiuchiolo* v. *New England Wholesale Tailors* (1930) 84 N.H. 329, 335 [150 A. 540].)

Indubitably juries and trial courts, constantly called upon to distinguish the frivolous from the substantial and the fraudulent from the meritorious, reach some erroneous results. But such fallibility, inherent in the judicial process, offers no reason for substituting for the case-by-case resolution of causes an artificial and indefensible barrier. Courts not only compromise their basic responsibility to decide the merits of each case individually but destroy the public's confidence in them by using the broad broom of ''administrative convenience'' to sweep away a class of claims a number of which are admittedly meritorious. The mere assertion that fraud is possible, ''a possibility [that] exists to some degree in all cases'' (*Klein* v. *Klein, supra,* 58 Cal.2d 692, 695), does not prove a present necessity to abandon the neutral principles of foreseeability, proximate cause and consequential injury that generally govern tort law.

Indeed, we doubt that the problem of the fraudulent claim is substantially more pronounced in the case of a mother claiming physical injury resulting from seeing her child killed than in other areas of tort law in which the right to recover damages is well established in California. For exam-

ple, a plaintiff claiming that fear for his own safety resulted in physical injury makes out a well recognized case for recovery.[4] (*Lindley* v. *Knowlton* (1918) 179 Cal. 298 [176 P. 440]; *Webb* v. *Francis J. Lewald Coal Co.* (1931) 214 Cal. 182 [4 P.2d 532, 77 A.L.R. 675]; *Vanoni* v. *Western Airlines* (1967) 247 Cal.App.2d 793 [56 Cal.Rptr. 115].) Moreover, damages are allowed for "mental suffering," a type of injury, on the whole, less amenable to objective proof than the physical injury involved here; the mental injury can be in aggravation of, or "parasitic to," an established tort. (*Sloane* v. *Southern California Ry. Co.*, *supra*, 111 Cal. 668; *Acadia, California, Ltd.* v. *Herbert* (1960) 54 Cal.2d 328 [5 Cal.Rptr. 686, 353 P.2d 294]; *Easton* v. *United Trade School Contracting Co.* (1916) 173 Cal. 199 [159 P. 597, L.R.A. 1916A 394].) In fact, fear for another, even in the absence of resulting physical injury, can be part of these parasitic damages. (*Acadia, California, Ltd.* v. *Herbert*, *supra*, 54 Cal.2d 328, 337; *Easton* v. *United Trade School Contracting Co.*, *supra*, 173 Cal. 199, 202.) And emotional distress, if inflicted intentionally, constitutes an independent tort. (*State Rubbish Collectors Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 338 [240 P.2d 282].) The danger of plaintiffs' fraudulent collection of damages for nonexistent injury is at least as great in these examples as in the instant case.

In sum, the application of tort law can never be a matter of mathematical precision. In terms of characterizing conduct as tortious and matching a money award to the injury suffered as well as in fixing the extent of injury, the process cannot be perfect. Undoubtedly, ever since the ancient case of the tavernkeeper's wife who successfully avoided the hatchet cast by an

---

[4]California's rule that plaintiff's fear for his own safety is compensable also presents a strong argument for the same rule as to fear for others; otherwise, some plaintiffs will falsely claim to have feared for themselves, and the honest parties unwilling to do so will be penalized. (Cf. 2 Harper & James, The Law of Torts (1956) § 16.15, p. 961.) Moreover, it is incongruous and somewhat revolting to sanction recovery for the mother if she suffers shock from fear for her own safety and to deny it for shock from the witnessed death of her own daughter. To the layman such a ruling must appear incomprehensible; for the courts to rely upon self-contradictory legalistic abstractions to justify it is indefensible. We concur with Judge Magruder's observation in 49 Harvard Law Review 1033, at page 1039: ''Once accepting the view that a plaintiff threatened with an injurious impact may recover for bodily harm resulting from shock without impact, it is easy to agree with Atkin, L.J. (*Hambrook* v. *Stokes Bros.*, [1925] 1 K.B. 141, 158-159]), that to hinge recovery on the speculative issue whether the parent was shocked through fear for herself or for her children 'would be discreditable to any system of jurisprudence.' ''

irate customer (*I de S et ux* v. *W de S,* Y.B. 22 Edw. iii, f. 99, pl. 60 (1348)), defendants have argued that plaintiffs' claims of injury from emotional trauma might well be fraudulent. Yet we cannot let the difficulties of adjudication frustrate the principle that there be a remedy for every substantial wrong.

2. *The alleged inability to fix definitions for recovery on the different facts of future cases does not justify the denial of recovery on the specific facts of the instant case; in any event, proper guidelines can indicate the extent of liability for such future cases.*

In order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably foreseeable.

In the absence of ''overriding policy considerations . . . foreseeability of risk [is] of . . . primary importance in establishing the element of duty.'' (*Grafton* v. *Mollica* (1965) 231 Cal.App.2d 860, 865 [42 Cal.Rptr. 306]. See also *McEvoy* v. *American Pool Corp.* (1948) 32 Cal.2d 295 [195 P.2d 783]; *Hergenrether* v. *East* (1964) 61 Cal.2d 440 [39 Cal.Rptr. 4, 393 P.2d 164].) As a classic opinion states: ''The risk reasonably to be perceived defines the duty to be obeyed.'' (*Palsgraf* v. *Long Island R.R. Co.* (1928) 248 N.Y. 339, 344 [162 N.E. 99, 59 A.L.R. 253].) Defendant owes a duty, in the sense of a potential liability for damages, only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous, and hence negligent, in the first instance. (See Keeton, Legal Cause in the Law of Torts (1963) 18-20; Seavey, *Mr. Justice Cardozo and the Law of Torts* (1939) 52 Harv.L.Rev. 372; Seavey, *Principles of Torts* (1942) 56 Harv.L.Rev. 72.)

Harper and James state the prevailing view. The obligation turns on whether ''the offending conduct foreseeably involved unreasonably great risk of harm to the interests of someone other than the actor. . . . [T]he obligation to refrain from . . . particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails.'' (2 Harper & James, The Law of Torts, *supra,* at p. 1018; fns. omitted.)

This foreseeable risk may be of two types. The first class involves actual physical impact. A second type of risk

applies to the instant situation. "In other cases, however, plaintiff is outside the zone of physical risk (or there is no risk of physical impact at all), but bodily injury or sickness is brought on by emotional disturbance which in turn is caused by defendant's conduct. Under general principles recovery should be had in such a case if defendant should foresee fright or shock severe enough to cause substantial injury in a person normally constituted. Plaintiff would then be within the zone of risk in very much the same way as are plaintiffs to whom danger is extended by acts of third persons, or forces of nature, or their own responses (where these things are foreseeable)." (2 Harper & James, The Law of Torts, *supra*, at pp. 1035-1036; fns. omitted.)[5]

Since the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk, that factor will be of prime concern in every case. Because it is inherently intertwined with foreseeability such duty or obligation must necessarily be adjudicated only upon a case-by-case basis. We cannot now predetermine defendant's obligation in every situation by a fixed category; no immutable rule can establish the extent of that obligation for every circumstance of the future. We can, however, define guidelines which will aid in the resolution of such an issue as the instant one.

We note, first, that we deal here with a case in which plaintiff suffered a shock which resulted in physical injury and we confine our ruling to that case. In determining, in such a case, whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident,

---

[5]The concept of the zone of danger cannot properly be restricted to the area of those exposed to *physical* injury; it must encompass the area of those exposed to *emotional* injury. The courts, today, hold that no distinction can be drawn between physical injury and emotional injury flowing from the physical injury; indeed, in the light of modern medical knowledge, any such distinction would be indefensible. As a result, in awarding recovery for emotional shock upon witnessing another's injury or death, we cannot draw a line between the plaintiff who is in the zone of danger of physical impact and the plaintiff who is in the zone of danger of emotional impact. The recovery of the one, within the guidelines set forth *infra*, is as much compelled as that of the other.

as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

The evaluation of these factors will indicate the *degree* of the defendant's foreseeability: obviously defendant is more likely to foresee that a mother who observes an accident affecting her child will suffer harm than to foretell that a stranger witness will do so. Similarly, the degree of foreseeability of the third person's injury is far greater in the case of his contemporaneous observance of the accident than that in which he subsequently learns of it. The defendant is more likely to foresee that shock to the nearby, witnessing mother will cause physical harm than to anticipate that someone distant from the accident will suffer more than a temporary emotional reaction. All these elements, of course, shade into each other; the fixing of obligation, intimately tied into the facts, depends upon each case.

In light of these factors the court will determine whether the accident and harm was *reasonably* foreseeable. ▮▮ Such reasonable foreseeability does not turn on whether the particular plaintiff as an individual would have in actuality foreseen the exact accident and loss; it contemplates that courts, on a case-to-case basis, analyzing all the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen. The courts thus mark out the areas of liability, excluding the remote and unexpected.

▮▮ In the instant case, the presence of all the above factors indicates that plaintiff has alleged a sufficient prima facie case. Surely the negligent driver who causes the death of a young child may reasonably expect that the mother will not be far distant and will upon witnessing the accident suffer emotional trauma. As Dean Prosser has stated: ''when a child is endangered, it is not beyond contemplation that its mother will be somewhere in the vicinity, and will suffer serious shock.'' (Prosser, The Law of Torts, *supra,* at p. 353. See also 2 Harper & James, The Law of Torts, *supra,* at p. 1039.)

We are not now called upon to decide whether, in the absence or reduced weight of some of the above factors, we would conclude that the accident and injury were not reasonably foreseeable and that therefore defendant owed no duty of due care to plaintiff. In future cases the courts will draw lines of demarcation upon facts more subtle than the compelling ones alleged in the complaint before us.

The courts have in the past, in analogous situations, drawn the limits of liability, applying general guidelines such as those above set forth to the specific facts of the cases. As examples of that process of definition we set forth the history of the "open car" cases, the rulings on recovery by persons not in privity of contract for defendant's negligence in drafting instruments, the decisions on the intentional infliction of emotional injury, the modern English cases, and some illustrative opinions that adjudicate the specific issue before us.

The ability of courts to limit liability predicated on tests largely based upon foreseeability is well illustrated by the "open car" cases. The prototype case is the suit against the owner of a vehicle for damage caused plaintiff by a third party who can commandeer the vehicle because of the owner's carelessness in leaving the keys inside. In *Richardson* v. *Ham* (1955) 44 Cal.2d 772 [285 P.2d 269], we posited liability on the owner of a bulldozer because of a "foreseeable risk of intermeddling" (p. 776), noting especially the great danger the bulldozer created and the special temptation it presented to third parties. Similarly, in *Hergenrether* v. *East, supra,* 61 Cal.2d 440, we upheld such liability of a truck owner on the basis of "greater potentiality of foreseeable risk" (p. 444) because of the possible danger of the vehicle, the time for which it was unattended, and the type of persons who frequent the neighborhood in which it was left.

These decisions have not led to untrammeled liability. Rather, applying the foreseeability test, the courts have held that the mere act of leaving a key in an automobile, although it may possibly raise a foreseeable risk that the car will be stolen, does not increase the risk of injury to other property and hence does not warrant liability: "[e]ven if she could have foreseen the theft, she had no reason to believe that the thief would be an incompetent driver." (*Richards* v. *Stanley* (1954) 43 Cal.2d 60, 66 [271 P.2d 23].) In short, "each case must be considered on its own facts to determine whether the [situation] in toto justifies the conclusion that the foreseeable risk of harm imposed is unreasonable, and that the defendant owner or one in charge of a vehicle has a duty to third persons in the class of the plaintiffs to refrain from subjecting them to such risk." (*Hergenrether* v. *East, supra,* 61 Cal.2d 440, 445; see also *England* v. *Mapes Produce Co.* (1965) 238 Cal.App.2d 120 [47 Cal.Rptr. 506]; *Murray* v. *Wright* (1958) 166 Cal.App.2d 589 [333 P.2d 111].)

In another category of cases, those involving the liability of a tortfeasor to a third person with whom he was not in privity

of contract for negligent draftmanship of a legal document, we have recognized the right of the injured party to compensation and set out guidelines for the determination of future cases. In *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 588 [15 Cal. Rptr. 821, 364 P.2d 685], we applied this rule to an attorney who drew a defective will, thereby causing damage to the intended third-party beneficiary. (See also *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358].)

In sanctioning recovery for injury caused by intentional infliction of mental distress, this court did not defer to the argument that liability should not be imposed because of the possible future difficulty in delimiting the area of liability. Defendants urged that if recovery were to be allowed for intentional infliction of emotional distress, actions would soon be forthcoming based upon every minor personal insult or indignity. We said: "That administrative difficulties do not justify the denial of relief for serious invasions of mental and emotional tranquility is demonstrated by the cases recognizing the right of privacy." (*State Rubbish Collectors Assn.* v. *Siliznoff, supra,* 38 Cal.2d 330, 338.) We rejected the contention "that to allow recovery in the absence of physical injury will open the door to unfounded claims and a flood of litigation, and that the requirement that there be physical injury is necessary to insure that serious mental suffering actually occurred" (*State Rubbish Collectors Assn.* v. *Siliznoff, supra,* 38 Cal.2d 330, 338).

Indeed, the argument that "there is no point at which such actions would stop" is no more plausible today than when it was advanced in *Winterbottom* v. *Wright* (1842) 10 M. & W. 109, 111. History has exposed the fallacy of the claim that abolition of privity in enterprise liability cases would lead to "the most absurd and outrageous consequences, to which I can see no limit" (p. 114). In taking another giant step forward, in imposing product liability in tort, we were not halted by the spectre of an inability to pre-judge every future case. The setting of boundaries upon that doctrine makes the problem of fixing lines of limitation here appear, by comparison, almost miniscule. The widening of the area of liability and the possibility of the encouragement of unfounded and undefinable claims in the products liability field was sweeping; here we deal with a comparatively isolated and unusual situation. We do not believe that the fear that we cannot successfully adjudicate future cases of this sort, pursuant to the

suggested guidelines, should bar recovery in an otherwise meritorious cause.

The fear of an inability to fix boundaries has not impelled the courts of England to deny recovery for emotional trauma caused by witnessing the death or injury of another due to defendant's negligence. We set forth the holdings of some English cases merely to demonstrate that courts can formulate and apply such limitations of liability.

The first and classic case, *Hambrook* v. *Stokes Bros., supra,* 1 K.B. 141, rejected the argument that recovery should be denied because of possible administrative difficulty. In *Hambrook* the defendant's servant left a truck parked at the top of a steep and narrow street with the engine running. The deceased, a pregnant woman, had walked with her children on their way to school to the point where they turned onto the street where the truck was parked. Because the driver did not take proper precautions, the truck started itself down the hill and struck one of the children. Although she herself was never in danger, the mother saw the runaway truck and feared greatly for the safety of her children. Upon inquiry she found that one of the children had been seriously injured; several months later both the mother and the foetus were dead. The trial court directed the jury that the father's suit for loss of services could succeed only if the death were caused by the mother's fear for her own safety, but the appellate court held that the plaintiff could recover even if the fear for the children brought about her demise.

Faced with the contention that their holding would increase the number of suits and foment possible fraudulent claims, Lord Justice Atkin quoted this passage: " 'I should be sorry to adopt a rule which would bar all such claims on grounds of policy alone, and in order to prevent the possible success of unrighteous or groundless actions. Such a course involves the denial of redress in meritorious cases, and it necessarily implies a certain degree of distrust, which I do not share, in the capacity of legal tribunals to get at the truth in this class of claim.' " (*Hambrook* v. *Stokes Bros., supra,* quoting from *Dulieu* v. *White and Sons* [1901] 2 K.B. 669, 681, opinion by Kennedy, J.)

In a recent application of the *Hambrook* rule, an English court permitted recovery by a widow of a man who developed severe psychoneurotic symptoms as a result of harrowing experiences, not involving his personal safety, while serving as a rescuer at a gruesome train wreck. The court stated that

the " 'test of liability for shock is foreseeability of injury by shock.' " (*Chadwick* v. *British Railways Board* [1967] 1 W.L.R. 912, 920, quoting from *King* v. *Phillips* [1953] 1 Q.B. 429, 441, opinion by Denning, L.J.)

Professor John Fleming of the School of Law, Boalt Hall, University of California, in a careful analysis of the development of English law on this subject, first explains, "It is evident, of course, that, to the extent of denying redress for certain kinds of negligently inflicted harm, the law is in effect withholding its protective mantle from corresponding human interests that may accordingly be infringed with impunity. To refuse a remedy for nervous shock is the equivalent of refusing to accede to an individual's claim for safeguarding his emotional security. It is also the same as saying that there is no 'duty' owed to exercise reasonable care to avoid inflicting this type of loss or injury. Although no longer quite as fashionable in this particular context, the same idea can also, finally, be expressed by asserting that such damage is 'too remote' or, what amounts to the same thing, that the defendant's negligence was not its 'proximate cause'." (Fleming, An Introduction to the Law of Torts (1967) p. 46.)

After explaining that certain English cases manipulated doctrinal approaches "to subserve ulterior purposes" in granting recovery in some situations and denying it in others, Fleming states that "a long-delayed change in attitude may perhaps be discerned in the latest decision by the Court of Appeal [*Boardman* v. *Sanderson* (1964) 1 W.L.R. 1317 (C.A.)], which sustained a father's claim for a mental shock he suffered upon hearing the screams of his boy when the latter's foot was negligently caught under the wheel of the defendant's car from which father and son had just alighted inside a service garage. Neither did the father fear for his own safety nor did he so much as even see the accident. Indeed, the claimant was not even a female—the prototype plaintiff in these cases being almost exclusively concerned with pregnancy injuries. Yet the court considered it sufficient to say that a duty was owed not only to the boy but also to his *near relatives,* who, to the defendant's *knowledge,* were on the premises within earshot and likely to come upon the scene if any injury befell him. It remains to be seen whether this relaxation, slight as it may be, might not eventually be extended to relatives whose presence, though not actually known, was yet *foreseeable* in accordance with the prevailing

test customarily applied to claims for physical injuries."
(Italics in original; fn. omitted.) (Fleming, An Introduction
to the Law of Torts, *supra*, at p. 54.)

The English courts have likewise marked out areas of lia-
bility, excluding those injuries that are remote and unex-
pected. Thus a distinguished English court has held that the
physical injury of a casual bystander resulting from shock or
fright upon witnessing an accident would present so unusual
and hence unforeseeable an event as to warrant a directed
verdict for defendant. "The driver of a car or vehicle, even
though careless, is entitled to assume that the *ordinary fre-
quenter* of the streets has sufficient fortitude to endure such
incidents as may from time to time be expected to occur in
them, including the noise of a collision and the sight of
injuries to others, and is not to be considered negligent
towards one who does not possess the customary phlegm."
(Italics added.) (*Bourhill* v. *Young* (1943) A.C. 92, 117
(Lord Porter); see, *id.* at pp. 98 (Lord Thankerton), 101
(Lord Russell), 104 (Lord MacMillan), and 107 (Lord
Wright); *King* v. *Phillips, supra,* 1 Q.B. 429, 442.)

▉ Thus we see no good reason why the general rules of
tort law, including the concepts of negligence, proximate
cause, and foreseeability, long applied to all other types of
injury, should not govern the case now before us. Any ques-
tions that the cause raises "will be solved most justly by
applying general principles of duty and negligence, and . . .
mechanical rules of thumb which are at variance with these
principles do more harm than good." (2 Harper & James,
The Law of Torts, *supra,* p. 1039; fn. omitted.) "The refusal
to apply these general rules to actions for this particular kind
of physical injury is nothing short of a denial of justice."
(Throckmorton, *Damages for Fright, supra,* 34 Harv.L.Rev.
260, 277; fn. omitted.)

In short, the history of the cases does not show the develop-
ment of a logical rule but rather a series of changes and
abandonments. Upon the argument in each situation that the
courts draw a Maginot Line to withstand an onslaught of
false claims, the cases have assumed a variety of postures. At
first they insisted that there be no recovery for emotional
trauma at all. (*Amaya* v. *Home Ice, Fuel & Supply Co.,
supra,* 59 Cal.2d 295, dissenting opinion by Peters, J., p. 328
fn. 9.) Retreating from this position, they gave relief for such
trauma only if physical impact occurred. (*Id.* at p. 325 fn. 4.)
They then abandoned the requirement for physical impact but

insisted that the victim fear for her own safety (*Amaya* v. *Home Ice, Fuel & Supply Co., supra,* 59 Cal.2d 295), holding that a mother could recover for fear for her children's safety if she simultaneously entertained a personal fear for herself. (*Lindley* v. *Knowlton, supra,* 179 Cal. 298.)[6] They stated that the mother need only be in the "zone of danger" (*Reed* v. *Moore* (1957) 156 Cal.App.2d 43, 47 [319 P.2d 80]). The final anomaly would be the instant case in which the sister, who observed the accident, would be granted recovery because she was in the "zone of danger," but the *mother,* not far distant, would be barred from recovery.

The successive abandonment of these positions exposes the weakness of artificial abstractions which bar recovery contrary to the general rules. As the commentators have suggested, the problem should be solved by the application of the principles of tort, not by the creation of exceptions to them. Legal history shows that artificial islands of exceptions, created from the fear that the legal process will not work, usually do not withstand the waves of reality and, in time, descend into oblivion.

We have explained that recovery here will not expose the courts to false claims or a flood of litigation. The test that we have set forth will aid in the proper resolution of future cases. Indeed, the general principles of tort law are acknowledged to work successfully in all other cases of emotional trauma.

Yet for some artificial reason this delimitation of liability is alleged to be unworkable in the most egregious case of them all: the mother's emotional trauma at the witnessed death of her child. If we stop at this point, however, we must necessarily question and reject not merely recovery here, but the viability of the judicial process for ascertaining liability

---

[6]In *Lindley* a 165-pound chimpanzee had entered plaintiff's house and attacked her children, whom she rescued from it. The court recognized that the concern of the mother for the safety of the children as well as concern for her own safety could have contributed to her fright. It states: "While, of course, Mrs. Lindley was greatly and perhaps chiefly concerned for her children . . . there is nothing in the testimony to indicate that she was not concerned for her own safety." (P. 302.) As a basis for reversal of plaintiff's verdict defendant urged that the court should have instructed the jury that "no recovery may be had on account of fright produced by apprehended danger or peril to a third person." The court affirmed, saying that the circumstances made "it impossible" that she should have been devoid of fear for herself" and that the instruction was therefor properly refused. Hence the court in substance sustained recovery for fright based upon a combination of fears, those arising from fear of the mother for the children as well as for herself.

for tortious conduct itself. To the extent that it is inconsistent with our ruling here, we therefore overrule *Amaya* v. *Home Ice Fuel & Supply Co.*, *supra*, 59 Cal.2d 295.

To deny recovery would be to chain this state to an outmoded rule of the 19th century which can claim no current credence. No good reason compels our captivity to an indefensible orthodoxy.

The judgment is reversed.

Peters, J., Mosk, J., and Sullivan, J., concurred.

TRAYNOR, C. J.—I dissent for the reasons set forth in *Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 297-315 [29 Cal.Rptr. 33, 379 P.2d 513]. In my opinion that case was correctly decided and should not be overruled.

BURKE, J.—As recently as 1963 this court, in *Amaya* v. *Home Ice, Fuel & Supply Co.*, 59 Cal.2d 295 [29 Cal.Rptr. 33, 379 P.2d 513], thoroughly studied and expressly rejected the proposition (pp. 298-299) that tort liability may be predicated on fright or nervous shock (with consequent bodily illness) induced solely by the plaintiff's apprehension of negligently caused danger or injury to a third person. As related in our *Amaya* opinion, plaintiff there was the mother of a 17-month-old boy who saw him struck by a truck; accordingly our ruling necessarily included all mothers of small children who observe them being injured. Yet today this court's *Amaya* decision is overruled by an opinion which disdains any discussion whatever of the history and policy of pertinent law painstakingly set forth in *Amaya*.

Every one of the arguments advanced in today's opinion was considered by this court and rejected, expressly or by fair implication, in *Amaya*.[1] Further, as *Amaya* points out (p. 304 of 59 Cal.2d), in every jurisdiction in this country that had ruled on the point at issue the decisions up to that time (1963) were unanimous in upholding the rule of nonliability.

So far as has been discovered, in not a single such jurisdiction has an appellate court ruled to the contrary since

---

[1] In *Amaya* the trial court sustained a general demurrer to the complaint and dismissed the action. The Court of Appeal reversed, and in its opinion pronounced the doctrine that is revived in the majority opinion here. (See (Cal.App.) 23 Cal.Rptr. 131.) Upon petition this court granted a hearing, thereby nullifying the Court of Appeal opinion. Our opinion affirmed the trial court.

*Amaya.*[2] But the majority make no attempt in today's opinion—as apparently they could not—to buttress their result with citations of cases based on American law, to say nothing of that of California. Instead, we are offered two English cases applying the 1925 *Hambrook* case (*Hambrook* v. *Stokes Bros.* [1925] 1 K.B. 141), whose ruling we expressly rejected in *Amaya* (pp. 303-304 [fn. 4], and 313, of 59 Cal.2d), and which, as already stated has not been followed or approved by any jurisdiction in this country.

The majority, obviously recognizing that they are now embarking upon a first excursion into the "fantastic realm of infinite liability" (*Amaya,* at p. 315 of 59 Cal.2d), undertake to provide so-called "guidelines" for the future. But notwithstanding the limitations which these "guidelines" purport to impose, it is only reasonable to expect pressure upon our trial courts to make their future rulings conform to the spirit of the new elasticity proclaimed by the majority.

Moreover, the majority's "guidelines" (*ante,* pp. 740-741) are simply a restatement of those suggested earlier by Professor Prosser (Prosser, Torts (2d ed., 1955) p. 182) they have already been discussed and expressly rejected by this court in *Amaya* (pp. 312-313). Upon analysis, their seeming certainty evaporates into arbitrariness, and inexplicable distinctions appear.[3] As we asked in *Amaya*: What if the plaintiff was honestly *mistaken* in believing the third person to be in danger or to be seriously injured? What if the third person had assumed the risk involved? How "close" must the relationship be between the plaintiff and the third person? I.e., what if the third person was the plaintiff's beloved niece or nephew, grandparent, fiancé, or lifelong friend, more dear to the plaintiff than her immediate family? Next, how "near"

---

[2]The courts of two states have expressly denied recovery: see *Barber* v. *Pollock* (1963) 104 N.H. 379 [187 A.2d 788] (wife witnessed from inside the house an accident in which her husband was killed); *Jelley* v. *LaFlame* (1968) 108 N.H. 471 [238 A.2d 728] (mother standing on side of highway witnessed an accident in which her 6-year-old daughter, who had alighted from a school bus, was crushed to death by a truck); *Knaub* v. *Gotwalt* (Pa. 1966) 422 Pa. 267 [220 A.2d 646], in which the court expressly rejected even the "impact" rule and noted that, as shown in 18 A.L.R.2d 220, virtually no jurisdiction permits recovery to a mere witness not in the zone of danger.

[3]Thus the Supreme Court of New Hampshire has recently recognized that to approve recovery by mothers of small children, as do the majority here, would create "the need . . . to impose arbitrary and illogical limitations to prevent the undue extension of the liability of an alleged negligent operator such as the defendant in this case." (*Jelley* v. *LaFlame* (1968) *supra,* 238 A.2d 728, 730.)

must the plaintiff have been to the scene of the accident, and how "soon" must shock have been felt? Indeed, what is the magic in the plaintiff's being actually present? Is the shock any less real if the mother does not know of the accident until her injured child is brought into her home? On the other hand, is it any less real if the mother is physically present at the scene but is nevertheless unaware of the danger or injury to her child until after the accident has occurred? No answers to these questions are to be found in today's majority opinion. Our trial courts, however, will not so easily escape the burden of distinguishing between litigants on the basis of such artificial and unpredictable distinctions.

Further, and again contrary to the assertions of the majority (*ante*, pp. 732-733), no fallacy or incongruity appears in the rule permitting recovery to one within the physical zone of danger for trauma suffered from fear of impact, but denying it to a person outside that zone. The impact feared must be to oneself, and it must be an objective fear—not merely that of an excessively imaginative or timid plaintiff. As pointed out in the leading case of *Waube* v. *Warrington* (1935) 216 Wis. 603, 612-613 [258 N.W. 497], "It is one thing to say that as to those who are put in peril of physical impact, impact is immaterial if physical injury is caused by shock arising from the peril. It is the foundation of cases holding to this liberal ruling, that the person affrighted or sustaining shock was *actually put in peril* of physical impact, and under these conditions it was considered immaterial that the physical impact did not materialize. It is quite another thing to say that those who are out of the field of physical danger through impact shall have a legally protected right to be free from emotional distress occasioned by the peril of others, when that distress results in physical impairment." (Italics added.) Thus, California's rule that a plaintiff's reasonable fear for his own safety is compensable presents neither an argument for the same rule as to fear for others, nor a danger of recovery based on the plaintiff's false claims of fear for himself.[4]

---

[4]Contrary to the assertion of the majority (*ante,* pp. 746-747), no California case has held that "a mother could recover for fear for her children's safety if she simultaneously entertained a personal fear for herself." As correctly stated in *Amaya* (p. 300 of 59 Cal.2d), *Lindley* v. *Knowlton* (1918) 179 Cal. 298 [176 P. 440], held only that liability may be predicated upon fright and consequent illness induced by the plaintiff's reasonable fear for her *own* safety, *even when* the plaintiff may also have feared for the safety of her children. And as likewise correctly stated in *Amaya* (p. 302), the holding in *Reed* v. *Moore* (1957) 156 Cal.App.2d 43, 47 [319 P.2d 80], was that a wife who was outside the zone of danger

The assertion of the majority (*ante,* p. 735) that "The denial of 'duty' in the instant situation [i.e., physical impairment resulting from emotional distress occasioned by apprehension of the peril of others] rests upon the *prime hypothesis* that allowance of such an action would lead to successful assertion of fraudulent claims," (italics added) is controverted by the very case cited in support. (*Waube* v. *Warrington, supra,* 216 Wis. 603, 613.) Instead of reliance on any such "prime hypothesis," the Wisconsin court had this to say in *Waube*: "The answer to this question cannot be reached solely by logic, nor is it clear that it can be entirely disposed of by a consideration of what the defendant ought reasonably to have anticipated as a consequence of his wrong. The answer must be reached by balancing the social interests involved in order to ascertain how far defendant's duty and plaintiff's right may justly and expediently be extended. It is our conclusion that they can neither justly nor expediently be extended to any recovery for physical injuries sustained by one out of the range of ordinary physical peril as a result of the shock of witnessing another's danger. Such consequences are so unusual and extraordinary, viewed after the event, that a user of the highway may be said not to subject others to an unreasonable risk of them by the careless management of his vehicle. Furthermore, the liability imposed by such a doctrine is wholly out of proportion to the culpability of the negligent tort-feasor, would put an unreasonable burden upon users of the highway, open the way to fraudulent claims, and enter a field that has no sensible or just stopping point."

As this court declared in *Amaya* (p. 315 of 59 Cal.2d), there is good sense in the conclusion of the court in *Waube* that "the liability imposed by such a doctrine is wholly out of proportion to the culpability of the negligent tort-feasor"; further, to permit recovery by every person who might adversely feel some lingering effect of the defendant's conduct would throw us into "the fantastic realm of infinite liability." Yet the majority opinion in the present case simply omits to either mention or discuss the injustice to California defendants flowing from such a disproportionate extension of their liability—an injustice which plainly constituted a "prime hypothesis" for rejection of the liability sought to

but witnessed a collision in which her husband was injured could not recover. Neither *Lindley* nor *Reed* holds, or even suggests, that a plaintiff may recover for fear for the safety of another if she can establish that she herself was in the zone of danger.

be imposed by the plaintiffs in *Waube* and in *Amaya*. (See also *Jelley* v. *LaFlame* (N.H. 1968) *supra,* 238 A.2d 728, 730, citing with approval and following this ground of decision expressed in *Waube* and in *Amaya*.)

Additionally, the majority fail to explain their bare assertion (*ante,* p. 733) that contributory negligence of Erin will defeat any recovery by plaintiff mother and sister.[5] The familiar and heretofore unquestioned principle is that the relationships of parent and child or of husband and wife *in themselves furnish no basis* for imputation of contributory negligence. (Witkin, Summary of Cal. Law (1960) Torts, § 341, p. 1542; Rest.2d Torts, § 488.) Is this principle now abrogated in California? If so, it is a ruling extending far beyond the confines of the particular issue now before us, and reaches potentially every negligence action in which the plaintiffs are members of the same family.

It appears to me that in the light of today's majority opinion the matter at issue should be commended to the attention of the Legislature of this state. Five years have elapsed since our *Amaya* decision, during which that body has not undertaken to change the law we there declared. We may presume, therefore, that the limitations upon liability there affirmed comport with legislative views. But if all alleged California tortfeasors, including motorists, home and other property owners, and governmental entities, are now to be faced with the concept of potentially infinite liability beyond any rational relationship to their culpability, then surely the point has been reached at which the Legislature should reconsider the entire subject and allow all interests affected to be heard.

I would affirm the judgment.

McComb, J., concurred.

---

[5]Neither does the majority opinion enlighten us as to how the contributory negligence of either (a) plaintiff mother or (b) plaintiff sister will assertedly defeat any recovery *by the other*.