Jo SAXTON, as Special Administrator and Personal Representative of the Estate of Betty Evelyn Kween, Deceased, Plaintiff,

v.

McDONNELL DOUGLAS AIRCRAFT COMPANY, a California Corporation, and General Dynamics Company, a California Corporation, Defendants.

No. CV–76–2989–PH.

United States District Court, C. D. California.

March 22, 1977.

Krutch, Lindell, Donnelly, Dempcy, Lageschulte & Judkins, P. S., by Richard F. Krutch, Vernon T. Judkins, Seattle, Wash., for plaintiff.

Tuttle & Taylor Inc., by William A. Norris, Ronald C. Peterson, Marjorie S. Steinberg, Douglas W. Beck, Los Angeles, Cal., Mendes & Mount, by James M. FitzSimons, New York City, Kirtland & Packard by Robert C. Packard, Belcher, Henzie & Biegenzahn by Leo J. Biegenzahn, Los Angeles, Cal., for McDonnell Douglas Corp.

Overton, Lyman & Prince by Fred S. Lack, Jr., Brenton F. Goodrich, Gregory A. Long, Los Angeles, Cal., for General Dynamics Corp.

## MEMORANDUM OF OPINION; ORDER FOR JUDGMENT

PEIRSON M. HALL, District Judge.

Betty Kween committed suicide on June 28, 1976.

The personal representative of her estate has filed a suit alleging her death was wrongfully caused by McDonnell Douglas and General Dynamics. The plaintiff seeks damages in the total sum of $11,510,000.00 ($1,500,000.00 for the loss of her care, comfort, and society; medical bills in the sum of $10,000.00; and $10,000,000.00 in punitive damages).

The defendants, McDonnell Douglas and General Dynamics, were the makers of the DC–10 aircraft which crashed, while in service of the Turkish Airlines, near Paris, France, on March 3, 1974.

The defendants have each filed a motion to dismiss.[1]

All parties have extensively briefed the questions raised.

A very brief statement of the background facts are required for an understanding of the matter before the Court.

Among the 346 persons killed in the Paris crash of March 3, 1974, were David Kween (the son of Cecil and Betty Kween) and Phyllis Kween (his wife), who left two small girls, then aged 1½ and 2½, surviving them, and left also Cecil and Betty Kween, the partially dependent parents of David Kween.[2]

Case No. CV–74–2007–PH was filed in this court on behalf of the two orphan girls and on behalf of Betty and Cecil Kween, the dependent parents of David Kween. Trial was had on compensatory damages only in that case in early 1976. It consumed about six weeks and resulted in a verdict of $1,509,950.00 in favor of the plaintiffs against the defendant McDonnell Douglas.[3]

■ Most of the plaintiffs in the various 200-odd cases filed in this court, covering 340 decedents, agreed to waive punitive damages and go to trial or settle for compensatory damages only. And most of them have since settled. The law of California was held to be applicable by an opinion of this Court in all of the cases (*In re Paris Air Crash of March 3*, 1974, 399 F.Supp. 732) and was accepted by all parties who settled. It was the law under which the Court instructed the jury in case No. 74–2007. By the law of California, only one total sum is allowed for a decedent, and the distribution of that sum among those entitled thereto is made by the Court. Cal.C.C.P. § 377; *Cross v. Pacific Gas & Elec. Co.*, 60 Cal.2d 690, 36 Cal.Rptr. 321, 388 P.2d 353 (1964); *Perkins v. Robertson*, 140 Cal. App.2d 536, 543, 295 P.2d 972 (1956). Of the total of $1,509,950.00 awarded in No. 74–2007, $50,000.00 was distributed by the Court as damages to Betty Kween, the suicide-decedent herein, and $50,000.00 to her husband, Cecil Kween, both of whom were

---

1. In considering any motions to dismiss, this Court is acutely mindful, as I am sure all District Judges in the Ninth Circuit are, of the attitude of the United States Court of Appeals for the Ninth Circuit concerning motions to dismiss, best expressed in *Corsican Productions v. Pitchess*, 338 F.2d 441, 442–443 (9th Cir. 1964), where the Court said:

   " '[T]he accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' (*Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)) ' * * * precludes dismissal for insufficiency of the complaint except in the extraordinary case where the pleader makes allegations which show on the face of the complaint some insu-

   perable bar to relief.' Wright, Federal Courts 250 (1963)."

2. The decedents are also survived by Mr. and Mrs. A. Stuart Case, the parents of Phyllis Kween, and the grandparents of the orphaned girls, who made no claim for damages.

3. The three defendants, McDonnell Douglas, General Dynamics, and Turk Hava Yollari (also known as THY and as Turkish Airlines), prior to the trial in No. 74–2007 made an agreement (which was filed *in camera* with the Court) in the Paris air crash cases by which they agreed, in effect, not to contest thereafter the question of liability in any court at any time or any place if the plaintiffs would waive punitive damages, and would share in a settlement or judgment against any of them.

held by the jury to be dependent parents of David Kween under Cal.C.C.P. § 377, as it stood on the date of the accident. Both the decedent Betty Kween and her husband Cecil Kween appeared and testified at the trial, which began January 20, 1976, and concluded on February 26, 1976.

The first question to consider, of course, is the matter of jurisdiction. There is no doubt that this Court has jurisdiction under the diversity statute, 28 U.S.C. § 1332, and it is unnecessary to discuss or determine whether or not the Court has jurisdiction under 28 U.S.C. §§ 1331(a), 1337 and 1338, or any of them.

■ While not stated in separate counts, the complaint is based on two concepts, viz., (1) product liability[4] resulting from the willful and intentional acts of the defendants in the manufacture and placing in commerce of the DC–10, knowing of inherent danger in its use from a faulty design and a faulty cargo door; and (2) conduct of the defendants towards Betty Kween in the deposition and at the trial, and the trial itself as a "test case." All of the acts of defendants are alleged to have been done by them with "oppression, fraud, or malice, express or implied" (Cal.C.C. § 3294), entitling plaintiff to an award of punitive damages.

Broadly, the complaint alleges defects in design and manufacture of the DC–10 plane which was involved in the crash; that defendants had knowledge of the defects; that the defendants acted willfully and ma-

liciously, for their own financial gain, in manufacturing said plane and marketing it; that they used the forum of the trial (No. 74–2007) as a "test case" by offering settlement far below actual value; that they exposed Betty Kween to needless rigors on deposition and cross-examination—all of which resulted in an irresistible urge to Mrs. Betty Kween to take her own life; that her death was foreseeable and within the risk of harm and "zone of physical, emotional and psychological impact."

It is also alleged that the "tremendous . . . publicity" and "notoriety" and "daily reminders by newspaper, television, and radio" of the crash and its consequences, combined with the "impact of the deaths of her son and daughter-in-law, caused Betty Kween to suffer "shock, depression, melancholia and uncontrollable and irresistible [sic] urge to take her life and join her son and daughter-in-law in death."

■ A Court must consider the well pleaded allegations of the complaint as true, as well as those facts of which the Court can take judicial notice,[5] which includes, of course, all of the files and records in the cases and proceedings pending in this court arising from the March 3, 1974, crash (both consolidated, MDL No. 172, and in said case, No. 74–2007).

It must be determined whether or not the plaintiff has shown by her allegations a legal obligation owed by the defendants to

---

**4.** The doctrine of product liability requires no proof of negligence. *Escola v. Coca-Cola Bottling Co.*, 24 Cal.2d 453, 461, 150 P.2d 436.

**5.** The doctrine of judicial notice is very broad. It goes so far as to permit the Court to take judicial notice of its records and the pleadings in other cases. *Wiley v. United States*, 144 F.2d 707, 708 (9th Cir. 1944); *National Fire Insurance Co. v. Thompson*, 281 U.S. 331, 336, 50 S.Ct. 288, 74 L.Ed. 881 (1930); *Diamond v. Pitchess*, 411 F.2d 565 (9th Cir. 1969); and to take judicial notice of things which are contrary to the pleadings and give them the same effect as if they had been set up as a defense in the answer and the proof were plenary, *Brown v. Piper*, 91 U.S. 37, 42, 43, 23 L.Ed. 200 (1895). The judge may resort to any means the judge

deems safe to refresh his memory. *Greeson v. Imperial Irrigation District*, 59 F.2d 529 (9th Cir. 1932); *Nev-Cal Electric Securities Co. v. Imperial Irrigation District*, 85 F.2d 886 (9th Cir. 1936). The latter case also stated (at 904), citing from *Greeson, supra*: " 'When a pleader states matter as fact which is out of harmony with facts which the court judicially knows, the averments in the pleadings are disregarded.' " In *Greeson v. Imperial Irrigation District, supra*, at 531, the Court stated that it may consider facts of "meetings of members of a community of common interest and wide concern of which the court *ought to have known*. *Brown v. Spilman*, 155 U.S. 665, 670, 15 S.Ct. 245, 39 L.Ed. 304." (Emphasis added.)

the decedent Betty Kween to prevent her from committing suicide, and that such obligation was breached by the defendants.

Before proceeding further, it should be noted that not by even the most imaginative construction of the complaint or the law can there be any legal obligation of the defendants to regulate or suppress the "daily reminders by newspaper, television and radio" or to prevent "tremendous publicity" attending or following the crash.

The idea of personal injury or suicidal death resulting from the shock of the death of a third person, where there has been no physical contact by defendants with the decedent, seems to have been an intriguing one, which has called forth long and learned discussion, not only in California but also in many other jurisdictions, as well as numerous articles and texts on the subject. It is a subject concerning which the Court in a Washington case, *Hunsley v. Giard*, 87 Wash.2d 424, 427, 553 P.2d 1096, 1098 (1976), *en banc*, stated: "Any attempt at a consistent exegesis of the authorities is likely to break down in embarrassed perplexity." [6]

*Tate v. Canonica*, 180 Cal.App.2d 898, 5 Cal.Rptr. 28 (1960), was a case of mental distress culminating in suicide. The lower court sustained a demurrer to the complaint without leave to amend, which was reversed by the appellate court. The central reason for the reversal was the allegation that the defendants "intentionally made threats, statements and accusations against said deceased for the purpose of harassing,

embarrassing and humiliating him in the presence of friends, relatives and business associates"; and that because thereof he became "physically and mentally disturbed"; and that as a direct result of such disturbance he committed suicide. There are no such allegations here, which by any stretch of the imagination under the pleadings or the facts of which the Court can take judicial notice, of such *personal* attitude or conduct of the defendants toward the suicide-decedent, Betty Kween.

The most often cited case (and thus entitled to be called the "leading case") in California dealing with third-party injury is *Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968). It was a personal injury case, as contrasted to the suicidal death in the instant case. In *Dillon* a mother sought damages for physical and mental suffering because she "was in close proximity to the . . . collision and personally witnessed said collision," which caused the death of her child.

In summary, the holding in *Dillon v. Legg* is that the indispensable element of duty in third-party shock [or suicide] cases is the "degree" of "foreseeability . . . [of] what the ordinary man under such circumstances should reasonably have foreseen. The courts thus mark out the areas of liability, excluding the remote and unexpected." *Dillon v. Legg, supra*, at 739–741, 69 Cal.Rptr. 72, at 79–81, 441 P.2d 912, at 919–921, incl.

All of the cases in Shepard's Citator citing *Dillon v. Legg* have been examined.

---

**6.** In that case, there was no physical contact to the plaintiff. It was a personal injury case. The conduct had occurred in the immediate vicinity of plaintiff. She was in her home and heard a "rather explosive sound" when the next-door neighbor drove her Lincoln Continental into the middle of the plaintiff's back porch utility room, putting it into shambles and knocking down two walls, shattering the windows, and generally damaging the articles in the room. When the plaintiff stepped into the room, the floor collapsed, causing her to bruise her legs. Her first concern was for her neighbor and then for her husband, and then *within an hour* she began to experience physical *discomfort*, which is described in the opinion in

some detail. The lower court entered a verdict against the plaintiff. The Washington Supreme Court reversed, with a very long and learned and thorough opinion exploring the law from the time in 1888 when, in the *Coultas* case, 13 A.C. 222 (P.C.) (Austl.), the English courts disapproved of allowance of any damages where the husband and wife were riding in a buggy near a railroad crossing and a rapidly moving train narrowly missed them, which caused the wife to faint, resulting in physical symptoms of injury. No such physical proximity existed in the instant case as in the *Hunsley* case, and no such immediate physical discomfort is alleged.

None of them have extended the doctrine of *Dillon v. Legg*. If anything, they have restricted it.

In *Rowland v. Christian*, 69 Cal.2d 108, 112–113, 70 Cal.Rptr. 97, 100, 443 P.2d 561, 564 (1968), while not in point, the Court said generally as to duty:

"A departure from this fundamental principle [that all persons are required to use ordinary care to prevent others being injured as a result of their conduct] involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the *consequences to the community of imposing a duty to exercise care with resulting liability for breach*, and the availability, cost, and prevalence of insurance for the risk involved. (Citations)." (Emphasis added.)

Rowland was a guest who severely injured his hand on a bathroom fixture which defendant knew was defective. The opinion reversed a summary judgment for defendant, and abolished the distinction between trespasser, licensee or invitee for purposes of establishing the concept of "duty."

In *McGarvey v. Pacific Gas & Elec. Co.*, 18 Cal.App.3d 555, 561, 95 Cal.Rptr. 894 (1971), the Court utilized and approved the above factors in sustaining summary judgment for a defendant. A motorcyclist collided with a car making a U-turn near defendant's plant; the driver was an employee coming to work, and plaintiff contended defendant should have provided more off-street parking, traffic control personnel, etc., and sued on theories of direct and vicarious liability. On the latter, summary judgment was granted because the driver was not acting within the scope of his employment. The appellate court also affirmed the sustaining of a general demurrer on the issue of direct liability, agreeing that there was no duty owing from defendant to plaintiff under the *Rowland* test.

*Archibald v. Braverman*, 275 Cal.App.2d 253, 79 Cal.Rptr. 723 (1969), *hearing denied* Sept. 24, 1969, was a personal injury case involving a 13-year-old who bought gun powder which exploded in the store. Within moments the mother arrived on the scene and saw the horrible injuries. She was so seriously shocked that she had to be institutionalized.

In allowing recovery to the mother, the Court said that the *Dillon* requirements were fulfilled, reversing the lower court's grant of summary judgment for defendant: (1) The parties were closely related; (2) the mother came within moments, so she was sufficiently "near"; and (3) as for "contemporaneous observance" of the tort, the shock is as great *immediately* following the event as if she had witnessed it.

In *Duff v. Harrah South Shore Corp.*, 52 Cal.App.3d 803, 125 Cal.Rptr. 259 (1975), a demurrer was sustained without leave to amend. The allegations were that plaintiff and decedent, husband and wife, had made an agreement with defendant that it would not accept checks for cashing above a certain limit. Sometime later, decedent changed the arrangement, with defendant's consent, and cashed checks with insufficient funds to cover them. Despondent, the husband committed suicide, and the widow sued. The Court held that a cause of action in tort may be allowed where there is a failure to perform a contractual duty or where that duty is negligently performed and the contractual relationship had ended; there was no duty not to rescind the contract and no basis for this tort action in the *Duff* case.

There is no duty not to let a person commit suicide in the absence of very unusual circumstances. Comparable unusual circumstances to support any claim for the death of Betty Kween simply are not alleged in this case.

In *Powers v. Sissoev*, 39 Cal.App.3d 865, 114 Cal.Rptr. 868 (1974), recovery was denied in the case where the initial injury was to a five-and-a-half-year-old child, which the mother did not witness. Rather, she learned of it within 30 minutes when she saw her child at the hospital. But the Court refused to extend the *Dillon* holding to cover that circumstance.

In *Krouse v. Graham*, 57 Cal.App.3d 752, 129 Cal.Rptr. 624 (1976), another recent case, the appellate court reversed the jury verdict for the plaintiff because a jury instruction omitted the requirement that physical injury be caused by the *direct emotional impact from the sensory and contemporaneous observance of the accident*; rather the injury might, from the testimony given, have been the effect of feelings of anger and retribution against defendant or from grief and sorrow at the loss of the loved one, which in that case was a wife.

The instant case refers to the shock and distress suffered by Betty Kween, which resulted in part from the wide publicity in England given to the case and to the *Kween* verdict, rather than the acts of the defendants. Certainly the defendants, manufacturers of the airplane, cannot be charged with the acts of the news media in the treatment of news which, by its sensationalism, may cause "shock and distress" to any individual.

The Court in *Dillon v. Legg, supra*, distinguished the *Amaya* case [*Amaya v. Home Ice, Fuel & Supply Co.*, 59 Cal.2d 295, 29 Cal.Rptr. 33, 379 P.2d 513 (1963)], but did not overrule it. In that case the Supreme Court of California reviewed the California authorities, and others, and affirmed the judgment of the trial court in sustaining a demurrer to a complaint which charged personal injuries suffered by a mother as a result of emotional shock induced by *watching defendant's truck negligently strike and run over her infant son*. The Court examined the doctrine of foreseeability; it examined the doctrine of contact; it examined the doctrine of visual damage to a loved one; and it concluded in the penultimate paragraph of the opinion as follows:

"There is good sense in the conclusion of the Wisconsin court that 'the liability imposed by such a doctrine is wholly out of proportion to the culpability of the negligent tort-feasor.' (*Waube v. Warrington* (1953) 216 Wis. 603, 258 N.W. 497, 501[2–4].) It begs the question to argue that 'If the loss is out of all proportion to the defendant's fault, it can be no less out of proportion to the plaintiff's innocence.' (Prosser, *Palsgraf Revisited* (1953) 52 Mich.L.Rev. 1, 17.) That obvious truism could be urged by every person who might adversely feel some lingering effect of the defendant's conduct, and we would then be thrown back into the fantastic realm of infinite liability." (Emphasis added.)

The allegations concerning the conduct of the defendants towards the decedent Betty Kween at her deposition and while on the witness stand, and the allegation that the trial was a "test case," cannot form any basis of violation of any duty owed by defendants to Betty Kween. This Judge handled all the proceedings in the case prior to the trial and conducted the trial. The plaintiffs and their counsel showed greater desire for an early trial than any of the defendants. Betty Kween came here from England of her *own* volition and was produced by the plaintiffs (of which she was one) for direct testimony. There was nothing untoward in the conduct of her cross-examination and no objection was made by plaintiffs' counsel to any conduct of defendants' counsel during her examination, both direct and cross. She appeared normal on the witness stand, answered the questions promptly, and without evasion or equivocation. Indeed, the complaint alleges that she participated in the trial (five weeks) and she "abandoned her desire to take her life." The complaint fails to state a claim for relief insofar as the above-mentioned allegations are concerned.

There remains for disposition the question of whether or not the remaining allegations of the complaint, other than those heretofore disposed of, are sufficient to state a duty and the breach thereof by

the defendants McDonnell Douglas and General Dynamics. Taking the indispensable elements of duty as set forth in *Dillon v. Legg*, hereinbefore referred to, it is evident that there was not that degree of foreseeability by McDonnell Douglas and General Dynamics manufacturing airplanes for sale, and sold, for the transportation of passengers throughout the world to require that they should have reasonably foreseen or be able to foresee that every passenger who used those airplanes did not have some heir or dependent relative who was subject to becoming so mentally unbalanced by the shock of a death as to compel them to commit suicide. Such a situation is, as stated in *Dillon v. Legg*, 68 Cal.2d at 739 and 741, 69 Cal.Rptr. 72, 441 P.2d 912, to be excluded as "remote and unexpected."

That the claim in the instant case is too "remote and unexpected" to impose a duty on defendants is demonstrated by the fact that in none of the cases arising from the deaths of 340 persons killed in this crash, and filed in this court, has any such claim been made; nor has any such claim been made in any of the more than 1,000 claims in nine other air crash cases handled by this judge; nor by the fact, of which this Court can take judicial notice, that every day there are millions of persons who fly airplanes manufactured in the United States throughout the world where no such mental illness occurs to a surviving relative of one who may be injured or killed in an airplane accident. To extend the doctrine of liability to include the defendants in this case for the suicidal death of Betty Kween because of the fact that her son was killed in an airplane manufactured by the defendants would be to declare that the law imposes unlimited "leapfrog" liability; it would mean that the manufacturer of airplanes and every subcontractor who manufactured a part which went into the airplane would have to foresee that every single person throughout the world who flew on an airplane might have a relative of unstable mental capacity, such as Betty Kween is described as being, and that if any one of those persons who flew were killed, that the relative of unstable mental capacity would be overwhelmed by an uncontrollable desire to commit suicide, and then commit suicide, for which the manufacturer, or any manufacturer under a subcontract of a vital element that went into such an airplane would be liable for the death of the suicidal decedent; it would also mean that that doctrine which extends to airplanes would have to extend to the manufacturer of every product that went into the market, whether it be chain saws, harvesters, heavy earth-moving equipment, steam shovels, locomotives, buses, automobiles, or any of the hundreds or thousands of edibles or drugs or clothing that are manufactured and sold throughout the United States; it would mean that every manufacturer of any product would have to bear the liability of injury or suicidal death which might result to a third person who is related to someone who might be killed or injured by the use of the product so manufactured and sold, whatever field it might be in.

Such is simply not the law, and to apply that doctrine would certainly be to include the remote and the unexpected and the almost unimaginable events which might occur from the injury or death of some person who might be injured or killed as the result of the use of such products.

The motion of defendant McDonnell Douglas, joined in by General Dynamics, to dismiss the complaint in the above-entitled case without leave to amend is hereby granted.

A final judgment to that effect will be prepared and entered.