[Civ. No. 15825. Fourth Dist., Div. Two. Apr. 13, 1977.]

LINDA KAREN REENDERS, an Incompetent Person, etc.,
Plaintiff and Appellant, v.
CITY OF ONTARIO, Defendant and Respondent.

**COUNSEL**

Anderson & Taves, John D. Taves, Herbert Hafif and Stephen L. Odgers for Plaintiff and Appellant.

Thompson & Colegate, Robert C. Coppo and Ellis J. Horvitz for Defendants and Respondents.

**OPINION**

**KAUFMAN, J.**—The trial court granted defendant City of Ontario (hereinafter City) summary judgment, and plaintiff appeals. She seeks a reexamination of the liability of a municipality for injuries sustained when a vehicle being hotly pursued by police collides with the victim's vehicle. We reexamine *Draper* v. *City of Los Angeles,* 91 Cal.App.2d 315 [205 P.2d 46] and *Pagels* v. *City & County of S. F.,* 135 Cal.App.2d 152 [286 P.2d 877], in the light of currently accepted negligence analysis and find their results sound as respects the case at bench. Accordingly, we affirm the summary judgment in favor of City.

*Facts*

On August 31, 1973, about 6:20 p.m., plaintiff was operating an automobile in the City of Ontario southbound on Mountain Avenue and was crossing the intersection of Mountain Avenue and Mission Boulevard with a green light when she was struck by a motorcycle driven by Daniel Scarsella through a red light. Scarsella was killed and plaintiff suffered severe permanent injuries.

At the time of the collision Scarsella was being pursued by Ontario city police officers in several police vehicles on which the standard warning devices (oscillating red and white light and siren) had been activated. At the time the collision occurred, however, none of the officers who were in pursuit were within sight of the scene of the accident. The details of the commencement and continuation of the police pursuit are as follows.

About 6:10 p.m. Officer Cypher received a radio dispatch advising that there was a reckless driver operating a motorcycle up and down the 200 block of I Street at a high rate of speed. He responded to the call and met with the complaining witness, Ms. Allen, who lived at 207 West I Street. Ms. Allen informed Officer Cypher that all afternoon a man had been drinking in the driveway of the residence located across the street.[1] She thought two men were involved. She stated they were driving up and down the street racing a motorcycle. She stated that one of the men, later identified as Scarsella, drove the motorcycle down the driveway of her residence and crashed through a gate at the rear yard. She started walking down to the driveway to where he was, and he turned the motorcycle around and attempted to run her over as he came out of the driveway.

As Officer Cypher was speaking with Ms. Allen, the motorcycle appeared being driven by Scarsella down I Street at a high rate of speed. Ms. Allen shouted, "That's him. That's the one." As Scarsella approached, Officer Cypher signaled for him to stop, but he failed to do so. Cypher immediately went to his police unit and put out a radio call advising that the suspect motorcycle rider was wanted for assault with a deadly weapon and for misdemeanor hit and run driving and was heading south on Euclid from I Street. Although Officer Cypher started to follow Scarsella in his police vehicle, he did not initiate pursuit because of congested traffic conditions and because Scarsella had traveled too far by the time Cypher got started.

In following Scarsella, Cypher merely operated his vehicle so as to keep pace with other traffic. He observed Scarsella run the red light at I Street and Euclid Avenue and reported this traffic violation on his radio. He observed Scarsella continuing to travel at a high rate of speed, weaving in and out of traffic, passing other southbound vehicles. He then observed Scarsella run the red light at G Street and observed another

---

[1]In his deposition Officer Cypher first stated that Ms. Allen told him the suspect lived across the street, but later corrected himself: "No, sir, that was incorrect. I referred to the report, and she advised that she had seen him drinking in the driveway. . . ."

police vehicle, driven by Officer Carosa, activate its red light and commence pursuit of Scarsella.

Officer Carosa first observed Scarsella traveling southbound on Euclid near G Street at a speed in excess of the posted limit. Carosa had heard Officer Cypher's radio report. When he observed Scarsella's conduct he activated his oscillating red and white light and siren and commenced pursuit. He broadcast Scarsella's location as the pursuit continued south on Euclid Avenue.

Officer Gulley had heard a radio broadcast indicating that Scarsella was traveling south on Euclid Avenue at a high rate of speed. At approximately Holt and Euclid, Officer Gulley observed the motorcycle proceeding south on Euclid at a speed well in excess of the posted limit. He engaged his oscillating red and white light and siren and commenced pursuit. Scarsella turned west onto Mission Boulevard and proceeded at a high rate of speed, weaving in and out of traffic in an unsafe and dangerous manner.

Officer Scraggs, who was stopped at the intersection of San Antonio and Mission, observed the motorcycle pass him traveling west on Mission at an estimated speed of 80 to 100 miles per hour. Officer Gulley was observed in pursuit some seconds behind, traveling between 65 and 75 miles per hour and accelerating. Several seconds later Officer Carosa passed by at about 65 to 75 miles per hour. Officer Scraggs then joined the pursuit.

As pursuit continued, the motorcycle disappeared into traffic and the police officers were thereby prevented from further observation of its progress. When Officer Gulley and, then, Officer Carosa arrived at the intersection of Mission and Mountain, they observed that the motorcycle had collided with the vehicle driven by plaintiff.

The chase spanned 31 intersections and, at some points at least, the traffic was heavy.

### Contentions, Discussion and Disposition

In support of the summary judgment, City contends that the governmental immunity statutes (e.g., Gov. Code, §§ 815.2, 820.2 and Veh. Code, § 17004) provide it immunity from liability and that, in any event, under the facts, City was not negligent as a matter of law. On the immunity issue City places considerable reliance on *Bratt* v. *City and*

*County of San Francisco,* 50 Cal.App.3d 550 [123 Cal.Rptr. 774]. On its nonnegligence theory, City relies on *Draper* v. *City of Los Angeles, supra,* 91 Cal.App.2d 315, and *Pagels* v. *City & County of S. F., supra,* 135 Cal.App.2d 152, as well as *Bratt.*

On the question of immunity, plaintiff makes several arguments including that *Bratt* is not controlling because it failed to consider Vehicle Code section 17001 and that, taking that statute into consideration, City is not statutorily immune. As to City's lack of negligence as a matter of law, plaintiff argues that *Draper* and *Pagels* are outmoded and incorrect for several reasons. First, they were decided before the enactment of Vehicle Code section 17001. Secondly, their analysis of the problem in terms of proximate cause is now discredited; that under currently accepted proximate cause doctrine the existence of proximate cause is not precluded as a matter of law; that proper analysis should revolve around whether City owed a legal duty to plaintiff to refrain from pursuing Scarsella; that the existence of such a duty is a matter of public policy and that a public policy mandating a holding that such a duty exists is now legislatively established by Vehicle Code section 17001.

 While plaintiff's analytical approach to the problem is basically correct, several of her arguments are unsound, and we conclude that City breached no duty owing to plaintiff and, therefore, was not negligent. Accordingly, we have no need to resolve the immunity question.

*Draper and Pagels and Vehicle Code Section 17001*

Plaintiff's argument that *Draper* and *Pagels* are outmoded because decided before the adoption of Vehicle Code section 17001 is without merit. It is true that *Draper* was decided in 1949 and *Pagels* in 1955 prior to the adoption of Vehicle Code section 17001 in 1959 (Stats. 1959, ch. 3, § 2, p. 1653). But section 17001 was derived from former Vehicle Code section 400 enacted in 1935 (Stats 1935, ch. 27, p. 152), and so far as the problem with which we are concerned in the present case, the provisions of present Vehicle Code section 17001 are substantially the same as those of former section 400.[2] Thus, the substance of present

---

[2]Vehicle Code section 17001 provides: "A public entity is liable for death or injury to person or property proximately caused by a negligent or wrongful act or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of his employment." (Stats. 1965, ch. 1527, § 2, p. 3620.)

Former Vehicle Code section 400 provided in pertinent part: "[E]very . . . municipal corporation . . . owning any motor vehicle is responsible to every person who sustains

Vehicle Code section 17001 was already part of the statutory law when *Draper* and *Pagels* were decided.

*Analysis: Proximate Cause and Duty*

Relying on *Vesely* v. *Sager,* 5 Cal.3d 153, 163-164 [95 Cal.Rptr. 623, 486 P.2d 151], plaintiff urges that the concept of proximate cause has been modernized and narrowed. In this, plaintiff is correct. ■ It is now generally recognized that, in terms of proximate cause, an actor is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of the actor's negligent conduct. *(Vesely* v. *Sager, supra.)* "Moreover, 'If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.' " *(Vesely* v. *Sager, supra,* 5 Cal.3d at p. 164, and authorities there cited.) Thus, in the case at bench and in *Draper* and *Pagels* if it was foreseeable that the motorist pursued by the police would flee in a reckless and hazardous manner, the fact that he did so would not relieve the City from liability on the ground of a lack of proximate cause if the City was otherwise liable for negligence.

Plaintiff is mistaken, however, in her analysis of the *Draper* and *Pagels* cases to the extent she has concluded they were decided on the basis of proximate cause. As correctly observed in *Bratt* (50 Cal.App.3d at p. 554), both cases were decided on lack of duty. *(Draper* v. *City of Los Angeles, supra,* 91 Cal.App.2d at pp. 318-319; *Pagels* v. *City & County of S. F., supra,* 135 Cal.App.2d at pp. 154-155, 156.)

The only criticism to which *Draper* and *Pagels* are perhaps justly subject is that they fail to articulate and apply the currently accepted view that the existence of duty in negligence analysis is dependent upon the balancing of competing public policy considerations. *(Dillon* v. *Legg,* 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]; *Biakanja* v. *Irving,* 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]; *Derrick* v. *Ontario Community Hospital,* 47 Cal.App.3d 145, 152-153 [120 Cal.Rptr. 566].)

---

any damage by reason of death, or injury to person or property as the result of the negligent operation of any said motor vehicle by an officer, agent, or employee or as the result of the negligent operation of any other motor vehicle by any officer, agent or employee when acting within the scope of his office, agency or employment; . . ." (Stats. 1935, ch. 27, p. 152.)

■ Plaintiff urges that we, as a court, are foreclosed from attempting to balance these policy considerations in the case at bench because Vehicle Code section 17001 (see fn. 2, *ante*) constitutes a legislatively established public policy mandating a finding of duty. We think not.

We note the likelihood that Vehicle Code section 17001 has nothing whatever to do with the case at bench inasmuch as plaintiff's injury was not caused by any "negligent or wrongful act or omission in the operation of any motor vehicle" by an employee of City within the meaning of section 17001. (Cf. *Greenberg* v. *County of Los Angeles,* 113 Cal.App.2d 389, 390-391 [248 P.2d 74].) The facts do not indicate any negligent operation of the police vehicles by the police officers, and it is not really any negligent operation of those vehicles of which plaintiff complains. The gravamen of plaintiff's charge is that the officers were negligent in undertaking and continuing their pursuit of Scarsella.

■ However, even assuming the applicability of section 17001, we think the most that can be said is that the Legislature may have intended thereby to countermand or alter the otherwise applicable rules of governmental immunity. (See Cal. Government Tort Liability (Cont.Ed. Bar 1964) §§ 7.63, 7.67 and 1969 Supp.) We cannot agree with plaintiff that the Legislature intended to make municipalities liable in cases like this as a matter of public policy. Section 17001 tells us that a municipality may be liable for injury caused by "a negligent . . . act or omission in the operation of any motor vehicle," but it does not tell us what constitutes negligence. The answer to that question is left to judicial decision. And, of course, at the time section 17001 was enacted in 1959 (Stats. 1959, ch. 3, § 2, p. 1653) and amended in 1965 (Stats. 1965, ch. 1527, § 2, p. 3620) the Legislature was presumably long since acquainted with the holdings in the *Draper* and *Pagels* cases and yet did not undertake to change the substance of the statutory provisions as respects the problem confronting us and the courts in *Draper* and *Pagels.* This lack of substantive change must be taken as indicating legislative approval of the policy established in *Draper* and *Pagels.* (*Buckley* v. *Chadwick,* 45 Cal.2d 183, 200 [288 P.2d 12, 289 P.2d 242], and numerous cases there cited.) Particularly is this so because, as previously pointed out, former Vehicle Code section 400 (Stats. 1935, ch. 27, p. 152) containing the same substantive provisions as present Vehicle Code section 17001 was part of our statutory law at the time those cases were decided. (See fn. 2, and accompanying text, *ante.*)

We proceed to a consideration of those policy factors said to be important: "[T]he foreseeability of harm to the plaintiff, the degree of

certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland* v. *Christian,* 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; accord: *Biakanja* v. *Irving, supra,* 49 Cal.2d at p. 650; *Commercial Standard Ins. Co.* v. *Bank of America,* 57 Cal.App.3d 241, 248 [129 Cal.Rptr. 91]; *Derrick* v. *Ontario Community Hospital, supra,* 47 Cal.App.3d at p. 153.)

We have no difficulty with the foreseeability of harm to the plaintiff. It is readily foreseeable that a motorist fleeing from pursuit by the police will operate his vehicle negligently and dangerously and cause injury to another user of the streets.

The degree of certainty that plaintiff suffered injury likewise presents no problem. Plaintiff's injuries are demonstrably real and severe.

The closeness of the connection between the defendant's conduct and the injury suffered is not so easy. Plaintiff contends that, as a matter of law, but for the negligence of the police in pursuing Scarsella, he would not have run the red light and collided with plaintiff at a speed in excess of the posted limit. We are not so certain. Although Officer Cypher began to follow Scarsella, he did not pursue him and did not turn on his siren or oscillating red and white light. It is a fair inference that Scarsella did not even know Officer Cypher was following him. Nevertheless, Cypher observed him proceed through two red lights at an excessive rate of speed. Scarsella had apparently been drinking and driving the motorcycle in a reckless and dangerous manner even before his contact with Officer Cypher. It is quite possible that he would have continued to do so, whether he was pursued or not, and that the collision would have occurred in any event. This, of course, would have been an appropriate question for the trier of fact were the summary judgment otherwise erroneous. Suffice it to say, the relationship between the defendant's conduct and plaintiff's injury is not necessarily a direct one.

No moral blame attaches to City's conduct. Its police officers were attempting to apprehend and remove from the public streets a man who had reportedly been drinking and driving a motorcycle in a reckless and dangerous manner and who was suspected of assault with a deadly

weapon as well as reckless driving and numerous other violations of the Vehicle Code.

As to the policy of preventing future harm, who can say whether greater harm would result from the imposition or nonimposition of a duty upon municipalities to refrain from pursuing a lawbreaker already engaged in reckless and dangerous operation of a motor vehicle on the public streets. The injury in this case was tragic. Conceivably, however, even more tragic results could have ensued had Scarsella not been pursued. Suppose he had lost control of his motorcycle and had run into a group of children standing on the sidewalk, killing or maiming several of them.

To impose a duty upon municipalities not to pursue a lawbreaker already engaged in dangerous conduct on the city streets would obviously cast a considerable burden on such cities and have serious consequences to the community. One of the prime functions of government is to insure law-abiding, orderly conduct. What is a law enforcement officer to do faced with a situation such as that confronting the police officers in this case? Nothing? The imposition of a duty not to pursue would severely restrict necessary law enforcement conduct without any guaranty that serious injury to members of the public might not ensue anyway.

The availability, cost and prevalence of insurance might not have been problems in days gone by. Today they are. The cost of liability insurance is already very substantial and is rising at a perceptible rate. Indeed, there is no guaranty that insurance is available to municipalities to cover injuries arising out of situations such as is presented by the case at bench.

In our assessment, considerations of public policy preponderate against the imposition of a duty upon a municipality and its police officers to refrain from pursuing a lawbreaker who is already operating a vehicle on the public streets and thoroughfares in a reckless and dangerous manner. Thus, we agree with the results in *Draper, Pagels,*[3] and *Bratt*[4] and adhere to those decisions insofar as they refuse to impose such a duty on municipalities under the circumstances here disclosed.

---

[3] We observe that imposition of a duty not to pursue is more strongly indicated in *Draper* and *Pagels,* in both of which the police vehicles were not using warning devices, than in the case at bench in which such warning devices were being used. We express no opinion on whether a duty should be found under the facts of *Draper* or *Pagels.*

[4] We express no opinion on the propriety of the holding in *Bratt* that the city was immune.

Our conclusion is not inconsistent with *Sparks* v. *City of Compton,* 64 Cal.App.3d 592 [134 Cal.Rptr. 684], which is, as was expressly therein recognized (64 Cal.App.3d at pp. 596-597) distinguishable. Crucially, the court there pointed out: "A fair construction of the pleadings shows alleged negligence *prior to the time the pursuit began.*" (Italics added.)

The judgment is affirmed.

Tamura, Acting P. J., and Morris, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 9, 1977.