Gary CHAMBERS and Linda Chambers Individually and as next Friend for Gary Andrew Chambers, Jr., Plaintiffs,

v.

UNITED STATES of America, Defendant.

C.A. No. H–83–2090.

United States District Court, S.D. Texas, Houston Division.

March 17, 1987.

Amended Finding of Fact April 3, 1987.

Craig Lewis, Fisher, Gallagher, Perrin & Lewis, Houston, Tex., for plaintiffs.

Andrea Larry and Keith Wyatt, United States Atty's. Office, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, JR., District Judge.

### Findings of Fact

1. On April 6, 1981, a vehicle-pedestrian accident occurred in the 500 block of Woodmist in Houston, Texas, between a postal vehicle driven by Ramon Alviar and a five year old child, Gary Chambers, Jr. (Testimony of Gary Chambers and Ramon Alviar; police accident report; Plaintiffs' Exhibit No. 31).

2. Ramon Alviar was delivering mail at the time of the accident, and pursuant to stipulation between the Plaintiffs and the Defendant he was acting within the course and scope of his employment for the United States of America. (Testimony of Ramon Alviar and Admissions of Fact contained in Joint Pre-Trial Order).

3. The accident occurred as Alviar was backing up the postal vehicle in order to retrieve a piece of mail which had fallen from his vehicle. (Testimony of Ramon Alviar).

4. Mr. Alviar attempted to back up his postal vehicle by looking into his rearview and side mirrors. At no time did he look back over his shoulder through any of the three windows on the sides and back of the postal vehicle to see if anyone was behind him or to see if it was safe for him to back up to get the mail. (Testimony of Ramon Alviar).

5. Mr. Alviar did not have to back up the postal vehicle to retrieve the letter; he could have stopped the vehicle and walked back the ten or twelve feet to retrieve the letter. (Testimony of Ramon Alviar).

6. There was limited vision to the rear when Mr. Alviar attempted to back the vehicle by only employing the use of mirrors. (Plaintiffs' Exhibit 19, 1–63 consisting of photographs of a postal vehicle identical to the one involved in the accident in the action at bar).

7. Ramon Alviar was familiar with the fact that children frequently played on the street in the 500 block of Woodmist. (Testimony of Ramon Alviar).

8. On April 6, 1981, Ramon Alviar saw that children were playing in the street when he gave the mail to Gary Chambers, Jr. (Testimony of Ramon Alviar).

9. Ramon Alviar admitted that in driving a mail truck in a residential area frequented by children playing in the street, one must be constantly on the lookout for children. (Testimony of Ramon Alviar).

10. On April 6, 1981, Ramon Alviar was negligent in attempting to back the postal vehicle by only looking in the rearview and side mirrors. Such negligence was a proximate cause of the occurrence in question.

11. On April 6, 1981, Ramon Alviar was negligent in attempting to back the postal vehicle without looking over his shoulder and through the rear windows of the postal vehicle. Such negligence was a proximate cause of the occurrence in question.

12. On April 6, 1981, Ramon Alviar was negligent in failing to keep a proper lookout to the rear of the postal vehicle, and

such negligence was a proximate cause of the occurrence in question.

13. On April 6, 1981, Ramon Alviar was negligent in failing to stop the postal vehicle and then retrieving the letter on foot by walking the three or four steps back to get the letter which was only ten or twelve feet from his vehicle. Such negligence was a proximate cause of the occurrence in question.

14. Since Ramon Alviar's negligence was a proximate cause of the occurrence in question, Ramon Alviar was not faced with a sudden emergency, and such doctrine is inapplicable to this case.

15. Since Ramon Alviar's negligence was a proximate cause of the occurrence in question, the accident made the basis of this suit was not an unavoidable accident, and such doctrine is inapplicable in this case.

16. The Chambers' home is located at the end of Woodmist, which is a dead end street. (Defendant's demonstrative exhibit of Woodmist plot drawing).

17. Mr. and Mrs. Chambers had warned and instructed their children about riding bicycles in the street. Such instructions included how far their children could ride down the street as well as warnings about riding their bicycles in the street after 3:30 PM or 4:00 PM when their neighbors would be driving home. (Testimony of Gary and Linda Chambers).

18. Immediately prior to the accident on April 6, 1981, Gary Chambers, Jr. was playing with his older brother and two or three other children. (Testimony of Ramon Alviar and Gary Chambers).

19. At the time of the accident, Gary Chambers, Jr., who was five (5) years old was riding his bicycle in the street. Gary was unsupervised, and he was playing in an area where his parents had previously told him not to play. (Testimony of Gary Chambers).

20. At the time of the accident, Gary Chambers, Jr.'s mother was at work. Gary's father, Gary Chambers, Sr., was inside the house watching television. (Testimony of Gary Chambers, Sr. and Linda Chambers).

21. Gary Chambers, Sr. was negligent in failing to supervise his son, Gary Chambers, Jr. Such failure to supervise was a contributing cause, but was not a proximate cause of the accident in question.

22. Gary Chambers, Sr. arrived at the scene of the accident to witness his son's body sprawled under the rear axle of the Defendant's vehicle, and the back of his son's head bloody from the injuries. (Testimony of Gary Chambers, Sr.).

23. When Gary Chambers, Sr. arrived at the scene of the accident, his son was conscious; his body was rigid; his son was crying out with a weird type of "screeching" sound; his eyes would roll back in his head; and he was vomiting various substances. (Testimony of Gary Chambers, Sr.).

24. Following the accident, Gary Chambers, Jr. was taken to the North Shore Hospital Emergency Room where he arrived unconscious but "arousable to deep stimuli." No Babinski sign was present, and the skull series films showed a fracture in the left occipital area. (Emergency Room records of North Shore Hospital, Plaintiffs' Exhibit 1).

25. Gary Chambers, Jr. was thereafter rushed via Life Flight helicopter to Hermann Hospital. In the Emergency Room at Hermann Hospital he was noted to be lethargic, but he did open his eyes on command. His pupils were equal, round, and reactive. Skull x-rays were taken which showed evidence of occipital skull fracture. (Hermann Hospital records; Plaintiffs' Exhibit 2). A definitive diagnosis could not be made, however, because separations in the skull are common in small children; the skull is made of several bones which grow together as an individual gets older. (Government Exhibit 2, pg. 9; Testimony of Dr. Jones). A diastasis of the left lambdoid suture in the occipital area is a minor injury involving the skull. It is not a brain injury. None of the functions controlled by the occipital area of the brain were found to be affected. (Testimony of Dr. Jones). Pain was noted in the left arm, Gary did not move his right arm on command, and his right arm did not respond to painful

stimuli. (Hermann Hospital records, Plaintiffs' Exhibit 2). In the Intermediate Care Unit at Hermann Hospital he was noted to be following commands. There were no motor deficits, no blood behind the eardrum, the Babinski reflex was normal, the cranial nerves were intact, and he exhibited an appropriate response to pain. (Testimony of Dr. Jones; Hermann Hospital records; Plaintiffs' Exhibit 2, pg. 9).

26. Skull x-rays showed separation of the sutures in the back of the head. (Testimony of Dr. Jones).

27. Dr. Jones saw Gary Chambers, Jr. again on April 7, 1981. He found no neurological deficit, no atrophy of muscles, and no paralysis. (Testimony of Dr. Jones).

28. While in the Intermediate Care Unit at Hermann Hospital, Gary Chambers, Jr. vomited blood on several occasions. (Testimony of Dr. Jones, Gary Chambers, Sr. and Hermann Hospital records, Plaintiffs' Exhibit 2).

29. On April 14, 1981, Gary Chambers, Jr. was readmitted to Hermann Hospital because of a large swollen area that had developed behind his left ear. The doctor diagnosed that Gary Chambers, Jr. had a cephalohematoma, a condition in which blood had accumulated between the skull and the scalp. His head was again x-rayed and the radiologist noted: "There has been no interval change in the previously described skull fracture involving the occipital bone since the examination of 4/6/81. There is no evidence of new fracture or new injury." (Testimony of Dr. Jones, Gary Chambers, Sr., Linda Chambers, and Hermann Hospital records, Plaintiffs' Exhibit 2).

30. Dr. Jones saw Gary for a final visit on May 26, 1981, about seven weeks after the accident. At that time, Dr. Jones noted that the cephalohematoma had resolved itself and that Gary Chambers, Jr. was neurologically intact. Dr. Jones reported that Gary was doing fine and that he was riding his bicycle again. (Defendant's Exhibit 3, pg. 3; Testimony of Dr. Jones).

31. Following the accident and the Hermann hospitalizations, Gary Chambers, Jr. began complaining of severe headaches. The headaches experienced by Gary Chambers, Jr. would be accompanied by complaints of pain, then vomiting, and thereafter lying down wherever he was at the time. (Testimony of Gary Chambers, Sr., Linda Chambers, and Dr. Jones).

32. The continuing headaches of Gary Chambers, Jr. caused his parents to take him to see Dr. Stuart Yoffe, their pediatrician, who hospitalized Gary Chambers, Jr. at Northwest Medical Center on June 27, 1981. An EEG performed during that hospitalization by Dr. Meyer L. Proler showed that "the patient's electrogram is moderately slow for age." (Testimony of Dr. Jones and Northwest Medical Center Hospital Records, Plaintiffs' Exhibit 7).

33. Gary Chambers, Jr. had experienced headaches previously during 1981, 1982, 1983, 1984, 1985, and up to mid–1986, although they had occurred less frequently as time went by. In Dr. Robert Zeller's medical opinion, the most recent headaches experienced by Gary Chambers, Jr. are post-concussion headaches and in reasonable medical probability were caused by the accident in question. (Testimony of Gary Chambers, Sr., Linda Chambers and Dr. Robert Zeller).

34. Gary Chambers, Jr. returned to his kindergarten class at the R.P. Harris School in the Houston Independent School District approximately one month after the accident. He completed kindergarten and was promoted to the first grade. (Government's Exhibit 6; Testimony of Linda Chambers).

35. Gary Chambers, Jr. entered the first grade at R.P. Harris School in August of 1981. In November 1981, when his family moved, Gary was thereafter enrolled in the Tomball School District. (Testimony of Gary Chambers, Sr.; Government's Exhibit 7, pgs. 8, 27, 28–60, 61–64).

36. At Tomball Elementary School it was discovered in November of 1981 that Gary Chambers, Jr. was exhibiting difficulties in learning. On December 4, 1981, Mrs. Maxey, Gary's teacher, performed an evaluation of Gary's performance. The results of the Tomball School District Evaluation were as follows:

(a) Fails to grasp simple word meanings; misunderstands words at grade level;

(b) Unable to follow instructions; always confused;

(c) Listens but rarely understands well; mind often wanders;

(d) Almost total lack of recall; poor memory;

(e) Limited vocabulary, primarily simple nouns; few precise, descriptive words;

(f) Always uses incomplete sentences with grammatical errors;

(g) Unable to recall the exact word;

(h) Difficulty relating ideas in a logical sequence;

(i) Difficulty relating isolated facts; incomplete and scattered ideas;

(j) Fair time concept; tends to dawdle; often late;

(k) Highly confused; unable to distinguish right-left, north-south-east-west;

(l) Below average, awkward motor coordination;

(m) Awkward, below average in manual dexterity;

(n) Rarely listens; attention frequently wanders;

(o) Often disorganized in manner of working; inexact, careless;

(p) Never finishes even with guidance.

(Tomball School District Records, Government's Exhibit 7, pp. 13–16). In February of 1982, Gary was tested, and he was placed in a special education program at Tomball Elementary School. (Testimony of Gary Chambers, Sr. and Government's Exhibits 6 and 7).

37. Beverly Maxey, Gary's teacher at Tomball Elementary, found that Gary could only identify four or five upper and lower case letters. The only letter Gary consistently identified in written material was the letter "I." (Tomball Elementary School Records, Government's Exhibit 7, pp. 20–21).

38. After only two months Gary withdrew from the special education program at Tomball Elementary School because his family moved again. (Testimony of Gary Chambers, Sr.; Government's Exhibit 7, p. 74).

39. In April of 1982, the family moved again, and Gary was thereafter enrolled in the Navasota school system. He remained in the Navasota School District until May of 1983. During Gary's enrollment there he received special instruction in reading and language two class periods each day. (Government's Exhibit 8, pp. 1, 19).

40. Gary Chambers, Jr. failed the first grade and had to retake the first grade at the Navasota School. (Navasota Independent School District Records, Government's Exhibit 8).

41. Gary's family moved again, and in August of 1983 Gary was enrolled in Owens Elementary in the Cy-Fair School District. At Owens Elementary, Gary was placed in Special Education classes with Heidi Kozak as his teacher.

42. The Special Education classes in the Cy-Fair Independent School District are set up so that one teacher can give individualized instruction to two students. In his first year with Ms. Kozak, Gary made significant gains. Gary met and surpassed all of the goals that were set for him by his teacher that year. (Testimony of Heidi Kozak; Government's Exhibit 9, pp. 18–48).

43. In his second year with Ms. Kozak, Gary continued to show significant improvement. Again, Gary met all of the goals that were set for him by Ms. Kozak that year. (Testimony of Ms. Kozak; Government's Exhibit 9, pp. 54–60, 67–73).

44. Heidi Kozak was Gary's teacher for Grades 2 and 3. During part of the third grade, Gary took some of his classes with students in the lower level regular classes for third grade students. (Testimony of Heidi Kozak and Dr. Francis Pirozzolo). While in Ms. Kozak's class, Gary was active, competitive, and self-confident. (Testimony of Heidi Kozak).

45. During Grade 4 at Cy-Fair Elementary School, Nancy Scott was Gary's teacher for reading, spelling, language and social studies. The evidence presented indicates that Gary was placed in the lowest level of Grade 4 students and did not advance upward to any other level. (Testimony of Dr. Francis Pirozzolo and records of

Cypress Fairbanks Independent School District, Government's Exhibit 9).

46. In 1985, Gary's family moved again. Gary transferred to Leider Elementary School in the Cy-Fair School District. Currently, Gary attends the 5th Grade in the Cy-Fair District and his teacher is Mrs. Carla Brosnahan. Gary is enrolled in regular classes at Leider Elementary School. Gary is in the lowest group of students referred to as the "resource group." His performance ranks him in the middle of the lowest group. (Testimony of Dr. Francis Pirozzolo from discussions with Mrs. Carla Brosnahan and Cypress Fairbanks Independent School District Records, Government's Exhibit 9).

47. On August 17, 1984, Gary Chambers, Jr. was evaluated by Dr. Francis Pirozzolo at the Neurosensory Center of the Methodist Hospital. (Testimony of Dr. Francis Pirozzolo; Dr. Pirozzolo's written report, Plaintiff's Exhibit 4).

48. Dr. Pirozzolo administered standard psychological tests to Gary Chambers, Jr. The battery of tests conducted by Dr. Pirozzolo included Intelligence Quotient tests, reaction time tests, motor skills tests, and academic performance tests. The results of the psychological tests indicated that Gary Chambers, Jr. suffered from learning disabilities. (Testimony of Dr. Francis Pirozzolo; Dr. Pirozzolo's report, Plaintiffs' Exhibit 4).

49. Based on his evaluation of the test data, Dr. Pirozzolo's findings were the following:

(a) delayed reaction time;

(b) inappropriate lateralization (*i.e.* Gary was quicker and more dominant with his left hand despite the fact that he is right handed);

(c) verbal and performance IQ scores were equivocal;

(d) motor overflow (*i.e.* when instructed to do something with one side of his body the other side would be doing the same thing);

(e) marked saccadic arrests on pursuit eye movement testing (*i.e.* inability to follow a moving object).

(Plaintiffs' Exhibit 4; Testimony of Dr. Pirozzolo).

50. Based on his findings, Dr. Pirozzolo determined that Gary's learning disabilities were of a subtype associated with closed head injuries. Dr. Pirozzolo opined that the closed head injury Gary sustained in the accident in April of 1981 resulted in a mild dysfunction of the left cerebral hemisphere. (Testimony of Dr. Pirozzolo; Plaintiffs' Exhibit 4).

51. Upon re-evaluation of Gary Chambers, Jr. in December of 1985, Dr. Pirozzolo noted the following:

(a) reaction time improved;

(b) lateralization appropriate;

(c) performance on trailmaking test improved.

Dr. Pirozzolo admitted that where delayed reaction time and other motor deficits are caused by a closed head injury, improvement will occur within six months to a year from the date of the injury. After that initial time period, improvement in those skills remains very unlikely. (Testimony of Dr. Pirozzolo).

52. On August 24, 1984, Gary Chambers, Jr. was examined by Dr. David Wachtel, a clinical psychologist. Dr. Wachtel administered a battery of tests including Intelligence Quotient tests, motor skills tests and academic skills tests. (Government's Exhibit 13).

53. Dr. Wachtel evaluated the test data, and he rendered the opinion that Gary Chambers, Jr. falls within a subtype of developmentally based language learning disabilities. Dr. Wachtel identified a cluster of symptoms exhibited by Gary Chambers, Jr. which include the following:

(a) a verbal IQ significantly lower than performance IQ;

(b) difficulty with vocabulary, spelling, general fund of information tasks;

(c) difficulty acquiring new information.

(Testimony of Dr. Wachtel; Government's Exhibit 13, pp. 1, 15, 29, 31).

54. Dr. Wachtel was of the view that the above-mentioned symptoms exhibited by Gary Chambers, Jr. indicated that Gary falls within a subtype of developmentally based language learning disabilities. (Tes-

timony of Dr. Wachtel; Government's Exhibit 13, pp. 1, 15, 29, 31).

55. Cy-Fair School District confirmed Dr. Wachtel's findings with respect to the discrepancy between verbal and performance IQ. An evaluation of Gary Chambers, Jr. performed by the Cy-Fair School District using the Wechsler Intelligence Scale for Children revealed a verbal IQ of 90 and a performance IQ of 109. (Government's Exhibit 9, p. 83).

56. Dr. Wachtel's opinion with respect to the developmental nature of Gary's learning disability is supported by the neurological data which indicates that Gary is neurologically intact. (Testimony of Dr. Jones; Testimony of Dr. Zeller; Deposition of Dr. Yoffee; Government's Exhibit 2, p. 44; Government's Exhibit 3, p. 3; Government's Exhibit 11).

57. Gary improved dramatically once he was placed in a stable school environment where he was given special help for his education needs. (Government's Exhibit 9, pp. 18–48, 54–60, 67–73; Testimony of Heidi Kozak).

58. Dr. Wachtel identified "risk factors" which would place Gary at risk for development of a learning disability:

(a) learning disabilities are ten times more likely to occur in males than in females (Testimony of Dr. Wachtel);

(b) learning disabilities run in families (Testimony of Dr. Wachtel; Testimony of Dr. Pirozzolo);

(c) learning disabilities are more likely to occur in children from a low socioeconomic background (Testimony of Dr. Wachtel);

(d) learning disabilities are more likely to occur where the child's parents have a limited educational background (Testimony of Dr. Wachtel).

59. The evidence showed that:

(a) Gary is of the male gender;

(b) Gary's brother, Dwight, has a developmental learning disability;

(c) Gary comes from a low socioeconomic background;

(d) Both of Gary's parents have limited education.

Moreover, the evidence showed that:

(a) Gary's family moved so frequently that he was in five different schools in five years;

(b) Gary had a number of ear infections as an infant;

(c) Gary has allergies.

Taking into account all of the risk factors that are present in Gary's case, it was Dr. Wachtel's considered opinion that Gary's learning disability was caused by the risk factors and not by the accident in question. Dr. Wachtel further opined that in reasonable psychological probability, Gary's learning disability was developmental in nature.

60. The Court finds that the preponderance of the evidence presented at trial showed that in reasonable medical probability and in reasonable psychological probability Gary Chambers, Jr.'s learning disability is developmental in nature and was not proximately caused by the injuries suffered by Gary Chambers, Jr. on April 6, 1981. (*See* Findings of Fact Nos. 27, 29, 51, 52, 53, 54, 56, 57, and 58; Testimony of Dr. Jones; Testimony of Dr. Wachtel).

61. On June 25, 1981, eleven weeks after the accident, Plaintiffs filed an administrative claim with the U.S. Postal Service. Included with the administrative claim were the medical records from North Shore Hospital, Hermann Hospital, and a medical narrative report from Dr. John M. Jones. The claim set forth the amount of the claim for $100,000.00 based on the physical injuries and post-concussion headaches.

62. Plaintiffs' claim was denied on February 22, 1983. Plaintiffs filed the instant action on March 31, 1983 seeking damages in excess of $750,000.

63. The past medical expenses which have been stipulated as reasonable and necessarily incurred in the treatment of Gary Chambers, Jr.'s injuries from the accident in question total $2,975.85. (Joint Pre-Trial Order, Admissions of Fact, pp. 10–11).

64. Linda Chambers lost one week of wages in caring for Gary Chambers, Jr. after the accident, such loss of earnings

amounting to $170.00. (Testimony of Linda Chambers).

## Conclusions of Law

1. At the time of the accident, Ramon Alviar was acting within the course and scope of his employment as a United States Postal Service employee.

■ 2. Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, any liability for torts committed by a federal employee within the course and scope of his employment is controlled by state law. *United States v. Muniz*, 374 U.S. 150 (1963).

■ 3. By virtue of the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, the United States of America is liable for any negligent acts and/or omissions committed by its employees, when such acts and/or omissions are committed within the course and scope of his employment for the United States of America. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

4. The Act provides that as a prerequisite to maintaining a suit against the United States for tortious conduct, a plaintiff must present notice of his or her claim to the appropriate federal agency. *Mack v. Alexander*, 575 F.2d 488, 489 (5th Cir. 1978). Only when the claim has been denied or six months have passed may a plaintiff bring suit in federal court on the claim. 28 U.S.C. § 2675(a).

5. The action at bar is properly before this Court pursuant to the provisions of the Federal Tort Claims Act. Title 28, U.S.C., Section 2671, *et seq.*

6. This Court has full jurisdiction of all matters in controversy and over all parties pursuant to the provisions of Title 28, U.S.C., Section 1346(b).

7. Venue lies in the Southern District of Texas, Houston Division, under the provisions of Title 28, U.S.C. § 1402(b), as elements of the Plaintiffs' claims concern allegations of negligence by an agent of the United States Postal Service, and the accident took place in Houston, Texas.

8. Although this suit is brought in federal court on a federal cause of action, the substantive law of the State of Texas is controlling with respect to the liability of the Defendant United States. *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

## The Negligence Standard

9. The essential elements of actionable negligence are the existence of a duty, the breach of that duty, proximate cause, and resulting injury. *Brooks v. United States*, 695 F.2d 984 (5th Cir.1983); *Colvin v. Red Steel Co.*, 682 S.W.2d 243 (Tex.1984).

10. "Duty" required for a finding of negligence is a duty to act as a reasonably prudent person under the same or similar circumstances, considering the reasonably foreseeable risk or probability of injury to the person situated as the plaintiff. *Northwest Mall, Inc. v. Lubri-Lon International, Inc.*, 681 S.W.2d 797, (Tex.App.—Houston [14th Dist.] 1986, no writ).

11. Any plaintiff must prove the existence of a legal duty owed to him by the defendant to establish tort liability. *Abalos v. Oil Development of Texas*, 544 S.W.2d 627 (Tex.1976) citing *Coleman v. Hudson Gas and Oil Corporation*, 455 S.W.2d 701 (Tex.1970).

12. The scope or ambit of a defendant's duty is a legal matter, distinct from the factual questions of breach and consequences. *Saucedo v. Phillips Petroleum Company*, 670 F.2d 634 (5th Cir.1982).

13. If the circumstances surrounding the occurrence would indicate the potential risk of harm to a reasonably prudent person, the duty to use ordinary care arises, and the plaintiff need not introduce evidence of the pertinent standard of care. *Figure World, Inc. v. Farley*, 680 S.W.2d 33 (Tex.App.—Austin 1984, writ ref. n.r.e.)

14. Whether a duty exists under the facts and circumstances of a particular case is a question of law. *J.R. Beadel and Co. v. De La Garza*, 690 S.W.2d 71 (Tex. App.—Dallas 1985, writ ref. n.r.e.).

**1456**

*Proper Lookout*

15. Proper lookout must be equated to such a lookout as a person of ordinary care would have kept under the same or similar circumstances. *Brown v. Gonzales*, 653 S.W.2d 854 (Tex.Civ.App.—San Antonio 1983, no writ). In order to hold that a person did not exercise proper lookout, the preponderance of the evidence must show that the actor did something or failed to do an act contrary to the duties imposed upon him. *Id.*

■ 16. Ramon Alviar has the legal duty to exercise ordinary care while driving his postal vehicle on the public streets and in residential areas where children are playing or may be present.

*Proximate Cause*

17. Proximate cause includes two essential elements: (1) foreseeability, and (2) cause in fact. *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex.1980), citing *Missouri Pac. R. Co. v. American Statesman*, 552 S.W.2d 99, 103 (Tex.1977); *Farley v. MM Cattle Co.*, 529 S.W.2d 751, 755 (Tex.1975); *East Texas Theaters, Inc. v. Rutledge*, 453 S.W.2d 466, 468 (Tex. 1970).

18. In order that proximate cause may be established, both elements of cause in fact and foreseeability must be shown by direct or circumstantial evidence. *Missouri Pac. R. Co. v. American Statesman*, 552 S.W.2d 99, 103, citing *Clark v. Waggoner*, 452 S.W.2d 437 (Tex.1970).

19. Cause in fact as an element of proximate cause means that the negligent act or omission was a substantial factor in bringing about the injury and without which no harm would have been incurred. *Missouri Pac. R. Co.*, 552 S.W.2d at 103, citing *Texas and Pacific Railway Company v. McCleery*, 418 S.W.2d 494 (Tex.1967). Foreseeability is satisfied by showing that the actor as a person of ordinary intelligence should have anticipated the danger to others by his negligent act. *Missouri Pac. R. Co.*, 552 S.W.2d at 103.

20. An act wanting in ordinary care which actively aids in producing an injury as a direct and existing cause need not be the sole cause; but it must be a concurring cause and such as might reasonably have been contemplated as contributing to the result under the attending circumstances. It matters not what the actor believed would happen, but whether he ought to have reasonably foreseen that the event in question, or some similar event, would occur. *Missouri Pac. R. Co.*, 552 S.W.2d at 104, citing *Clark v. Waggoner*, 452 S.W.2d at 440.

21. In the action at bar, the preponderance of the evidence showed that Ramon Alviar knew the route he was taking, and he knew that there were children playing in the street.

*Negligence of a Minor*

■ 22. Texas law holds that in order to be capable of negligence a child must be capable of exercising those qualities of attention, perception, knowledge, experience, intelligence, and judgment which are necessary to perceive the risk and to realize its unreasonable consequences. *Yarbrough v. Berner*, 467 S.W.2d 188 (Tex.1971). In *Yarbrough*, the Texas Supreme Court ruled that a child between the ages of four and five was incapable of negligence as a matter of law. Accordingly, Gary Chambers, Jr. was not negligent.

*Unavoidable Accident*

■ 23. Unavoidable accident is present when an event occurs which was not proximately caused by the negligence of any party to the event. *Yarbrough v. Berner*, 467 S.W.2d 188, citing *Dallas Ry. & Terminal Co. v. Bailey*, 151 Tex. 359, 250 S.W.2d 379 (1952); *Hicks v. Brown*, 136 Tex. 399, 151 S.W. 790 (1941). In *Yarbrough v. Berner*, the Texas Supreme Court held that where the evidence showed that a young child who is incapable of negligence darts into the path of a vehicle, the proof of such facts raised the issue of unavoidable accident. The *Yarbrough* Court cited *Wheeler v. Glazer*, 137 Tex. 341, 153 S.W.2d 449 (Tex.1941), where the Texas Supreme Court ruled that the occurrence in question is an unavoidable accident if it happened without the negligence of either of the parties to the suit. *Yar-*

*brough v. Berner,* 467 S.W.2d at 192, *citing Wheeler v. Glazer,* 137 Tex. 341, 153 S.W.2d 449 (1941). In the instant suit, in order for the Defendant to raise the defense of unavoidable accident, the preponderance of the evidence must show that the accident in question happened without the negligence of either of the parties. The Court has determined that the negligent acts of the Defendant postal employee were the proximate cause of the accident. Therefore, the doctrine of unavoidable accident is not applicable to the instant action.

### Sudden Emergency

24. The sudden emergency doctrine concerns negligence. The doctrine is used to excuse conduct that would otherwise constitute negligence. If the party attempting to invoke the doctrine is negligent before the emergency arises, the sudden emergency doctrine is not applicable, since it cannot be used by a person whose negligence helped create the situation. *Higginbotham v. Ritchie,* 367 S.W.2d 210 (Tex.Civ.App.—Ft. Worth, 1963, writ ref'd n.r.e.).

■ 25. In the action at bar, proper lookout necessarily relates to a time prior to the occurrence of the alleged emergency and the sudden emergency doctrine is therefore not applicable to this case. As indicated earlier in Finding of Fact No. 12, the Court finds that the postal employee, Ramon Alviar, failed to keep a proper lookout.

26. The preponderance of the evidence in the instant action demonstrates that on the occasion in question Ramon Alviar was negligent:

(a) in failing to maintain a proper lookout,

(b) in the manner in which he chose to back the postal vehicle at the time in question, and

(c) in attempting to retrieve the letter by backing the postal vehicle as opposed to stopping the vehicle and walking back the ten or twelve feet to retrieve the letter.

27. The preponderance of the evidence in this case demonstrates that Ramon Alviar's acts of negligence were the proximate cause of the occurrence in question.

### Contributory Negligence of the Parent

■ 28. The preponderance of the evidence showed that Gary Chambers, Sr. failed to properly supervise his minor child, Gary Chambers, Jr. on the occasion in question, since he was watching television in the house prior to and at the time of Gary, Jr.'s accident.

29. The preponderance of the evidence further showed that Gary Chambers, Sr.'s acts and/or omissions although negligent, were a contributing cause but not a proximate cause of the accident in question.

30. Texas law holds that the contributory negligence of a child's parents is not imputed to the child so as to bar the child's cause of action for personal injuries. *Lowery v. Barry,* 153 Tex. 411, 269 S.W.2d 795 (Tex.1954). However, the parents' own contributory negligence may act so as to reduce or defeat the parents' recovery for medical expenses incurred on behalf of the child. *Id.*

31. In *Thacker v. J.C. Penney Co.,* 254 F.2d 672, 679 (5th Cir.1958), *cert. denied,* 358 U.S. 820, 79 S.Ct. 31, 3 L.Ed.2d 61 (1959), the Fifth Circuit rearticulated the principle established in *Lowery.* The Court addressed the issue of whether the parents' contributory negligence would bar recovery sought by the parents for the benefit of the child. The Fifth Circuit held that when the parent brings an action for his own benefit to recover damages which he has suffered because of the injury to his child, the parents' contributory negligence will bar recovery by the parent.

### Comparative Negligence

32. With the advent of comparative negligence in the State of Texas, if the parents are found to be negligent in failing to supervise their child, the parents' recovery of medical expenses up to the child's eighteenth birthday would be reduced by the percentage of their fault. *Parker v. Highland Park, Inc.,* 565 S.W.2d 512 (Tex. 1978).

33. In a case controlled by the Texas comparative negligence statute, Vernon's Civ.St. art. 2212a, § 1, a party's contributory negligence that is established as a

matter of fact or as a matter of law must then be compared with the negligence of the other parties. *Parker,* 565 S.W.2d at 521.

34. In the instant action, the Court has determined that Gary Chambers, Jr., who was five years of age at the time of the accident in question, was incapable of negligence as a matter of law. Moreover, this Court has determined that the minor child's father, Gary Chambers, Sr., was negligent in failing to supervise his minor child at the time of the event in question. This Court finds that because Gary Chambers, Sr. was negligent in failing to supervise his five year old child, the recovery of medical expenses sought by him in the amount of $2,975.85 should be reduced by 20%. Therefore, the Court awards damages in the amount of $2,380.67.

### Bystander Recovery

■ 35. In determining whether to allow a plaintiff recovery for his mental pain and suffering under the theory of negligent infliction of mental anguish, the plaintiff's mental suffering should have been foreseeable to the defendant at the time of the accident. Texas courts follow the guidelines set out in *Landreth v. Reed,* 570 S.W.2d 486 (Tex.Civ.App.—Texarkana 1978, no writ) for determining foreseeability in an action for bystander recovery:

(1) Whether the plaintiff was located near the scene of the accident;

(2) Whether the shock resulted from a direct emotional impact upon the plaintiff or from the sensory and contemporaneous observance of the accident;

(3) Whether the plaintiff and the victim were closely related.

In the suit at bar, Gary Chambers, Sr. would be entitled to receive compensation for negligent infliction of emotional distress incurred as a result of witnessing his son's injuries after the accident in question.

36. The first two factors abovementioned require a relatively close connection in both geography and time between the accident and the resulting injury. Courts have denied recovery if the plaintiff is told of the accident at a later time instead of witnessing the event. *General Motors*

*Corp. v. Grizzle,* 642 S.W.2d 837 (Tex.Civ. App.—Waco 1982, writ dism.). The triggering of the mental anguish is not only from perceiving a collision, but also from the realization of its consequences. *Grizzle,* 642 S.W.2d at 844.

37. *Bedgood v. Madalin,* 589 S.W.2d 797 (Tex.Cir.App.—Corpus Christi 1979, writ granted), presented the issue of whether a bystander parent could recover damages for mental anguish when he heard the impact of an automobile striking his son and then observed his son's injuries at the scene of the accident. The *Bedgood* Court allowed recovery for mental anguish following *Landreth v. Reed, supra,* in which the Texas appellate court concluded that it would follow the lead set by *Dillon v. Legg,* 68 Cal.2d 728, 441 P.2d 912, 69 Cal.Rptr. 72 (1968) and allow a bystander's recovery where a person's negligence causes manifested mental anguish which was foreseeable by the negligent party.

38. In *Newman v. Minyard Food Stores, Inc.,* 601 S.W.2d 754 (Tex.Civ.App. —Dallas), *aff'd,* 612 S.W.2d 198 (Tex.1980), a husband sued to recover damages for his own mental anguish resulting from witnessing his wife slip and fall and from observing her resulting injuries. The *Newman* Court held that in a case where the plaintiff seeks damages for bystander recovery, if the plaintiff is able to prove that an emotional injury occurred, then the issue focuses on whether the defendant could reasonably have foreseen that the bystander parent would suffer emotional injury by observing his son's injuries at the scene of the accident.

39. The evidence showed that the postal employee, Ramon Alviar, knew that there were children playing in the cul-de-sac area of the residential neighborhood where Gary Chambers, Jr. was struck. The Court holds that the Defendant postal worker could have foreseen that if the minor child, Gary Chambers, Jr., was struck down by a postal vehicle, the boy's father would suffer emotional injuries resulting from his observation of his child's injuries at the scene of the accident. The Court awards the Plaintiff's father, Gary Chambers, Sr.,

damages in the amount of $30,000 for emotional injuries proximately caused by the negligent acts of the postal employee, Ramon Alviar. The damage award shall be reduced by twenty percent (20%) due to the contributory negligence of the Plaintiff, Gary Chambers, Sr. Therefore, the Court awards the Plaintiff, Gary Chambers, Sr., damages in the amount of $24,000.00 for mental anguish proximately caused by the negligent acts of the Defendant postal employee.

### Past and Future Pain and Suffering and Mental Anguish

■ 40. The evidence presented at trial showed that the minor child, Gary Chambers, Jr., suffered from severe headaches as a proximate result of the accident and the negligent acts of the Defendant postal employee, Ramon Alviar. (See Findings of Fact Nos. 33, 34, and 35) The Court awards damages to Gary Chambers, Jr. in the amount of $50,000.00 for past conscious physical pain and suffering. The Court also awards $20,000.00 to Gary Chambers, Jr. for future conscious pain and suffering. The evidence presented at trial further showed that the minor child, Gary Chambers, Jr., was rushed to Hermann Hospital via Life Flight helicopter after the accident in question and that he endured emotional trauma as a proximate result of the accident. The Court awards damages to Gary Chambers, Jr. in the amount of $30,000.00 for past mental anguish proximately caused by the negligent acts of the Defendant postal employee. The Court also awards damages to Gary Chambers, Jr. in the amount of $20,000.00 for future mental anguish proximately caused by the negligent acts of the Defendant postal employee.

### Physical Psychological Impairment

■ 41. The evidence presented showed that Gary Chambers, Jr. suffered severe headaches in the past and continues to suffer headaches that are psychologically incapacitating. The Court awards $50,000.00 to Gary Chambers, Jr. for past and future physical psychological impairment proximately caused by the negligent acts of the Defendant.

■ 42. The Court has determined that the learning disability exhibited by Gary Chambers, Jr. is developmental in nature and was not proximately caused by any negligent acts of the Defendant postal employee. (See Findings of Fact Nos. 58, 59 & 60). Therefore, the Court does not award any damages to the Plaintiff, Gary Chambers, Jr., for his developmental learning disability.

43. Accordingly, the Court has determined the applicability of the following damage awards:

| | |
|---|---|
| Medical Expenses | $ 2,380.67 |
| Bystander recovery for mental anguish | 24,000.00 |
| Past conscious physical pain and suffering | 50,000.00 |
| Future conscious physical pain and suffering | 20,000.00 |
| Past mental anguish of the minor child | 30,000.00 |
| Future mental anguish of the minor child | 20,000.00 |
| Physical psychological impairment, past and future | 50,000.00 |
| Loss of earnings (Linda Chambers) | 170.00 |
| TOTAL | $196,550.67 |

In the event that the foregoing Findings of Fact also constitute Conclusions of Law, they should be treated as such. In the event that the foregoing Conclusions of Law also constitute Findings of Fact, they are adopted as such.

Counsel will prepare and submit an appropriate judgment within twenty (20) days incorporating these Findings of Fact and Conclusions of Law.

### AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

On March 17, 1987, the Court entered Findings of Fact and Conclusions of Law in the instant action.

The Court awarded damages totaling $196,550.67 to the Plaintiffs. The Court found that Gary Chambers, Sr. was negligent in failing to supervise his son, Gary Chambers, Jr., but such failure to supervise was not a proximate cause of the accident in question. (See Findings of Fact No. 21 and Conclusions of Law Nos. 28 and 29). Accordingly, the Court reduced the

damage awards of the father Gary Chambers, Sr. by his percentage of the fault. (*See* Conclusions of Law Nos. 30, 31, 32, and 33). This Court determined the father's percentage of the fault to be twenty percent. (*See* Conclusions of Law No. 34). The Court therefore reduced the award of medical expenses by twenty percent and awarded Gary Chambers, Sr. $2,380.67 for medical expenses. (*Id.*) Moreover, the Court reduced the bystander recovery of Gary Chambers, Sr. by twenty percent to $24,000.00. (*See* Conclusions of Law No. 39).

In *Parker v. Highland, Inc.*, 565 S.W.2d 512 (Tex.1978), the Texas Supreme Court held that a recovery will only be reduced when the plaintiff's negligence is also a proximate cause of the occurrence.

Accordingly, the Court finds that Conclusion of Law No. 34 should be amended to read:

In the instant action, the Court has determined that Gary Chambers, Jr., who was five years of age at the time of the accident in question, was incapable of negligence as a matter of law. Moreover, this Court has determined that the minor child's father, Gary Chambers, Sr., was negligent in failing to supervise his minor child at the time of the event in question, although such negligence was not a proximate cause of the accident. The Court finds that because Gary Chambers, Sr. did not proximately cause the accident in question, his recovery of medical expenses in the amount of $2,975.85 should not be reduced by twenty percent. *Id.* Therefore, the Court awards damages in the amount of $2,975.85.

The Court further finds that Conclusion of Law No. 39 should be amended to read:

The evidence showed that the postal employee, Ramon Alviar, knew that there were children playing in the cul-de-sac area of the residential neighborhood where Gary Chambers, Jr. was struck. The Court holds that the Defendant postal worker could have foreseen that if the minor child, Gary Chambers, Jr., was struck down by a postal vehicle, the boy's father would suffer emotional injuries resulting from his observation of his child's injuries at the scene of the accident. The Court awards the Plaintiff's father, Gary Chambers, Sr., damages in the amount of $30,000 for emotional injuries proximately caused by the negligent acts of the postal employee, Ramon Alviar. The damages award shall not be reduced because the contributory negligence of the Plaintiff, Gary Chambers, Sr. did not proximately cause the accident in question. *Parker*, 565 S.W.2d at 521.

The Court finds that Conclusion of Law No. 43 should be amended to read:

Accordingly, the Court has determined the applicability of the following damage awards:

| | |
|---|---:|
| Medical Expenses | $ 2,975.85 |
| Bystander recovery for mental anguish | 30,000.00 |
| Past conscious physical pain and suffering | 50,000.00 |
| Future conscious physical pain and suffering | 20,000.00 |
| Past mental anguish of the minor child | 30,000.00 |
| Future mental anguish of the minor child | 20,000.00 |
| Physical psychological impairment, past and future | 50,000.00 |
| Loss of earnings (Linda Chambers) | 170.00 |
| TOTAL | $203,145.85 |

In addition, the Court finds that the following Conclusion of Law is applicable:

44. Under Federal law, 28 U.S.C. § 2675(b) provides in pertinent part that the original claim amount will not be a limit on the amount that can be recovered in a later court action "where the increased amount is based solely upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the Federal agency, or upon allegations and proof of intervening facts relative to the amount of the claim." In *Molinar v. United States*, 515 F.2d 246 (5th Cir.1975), the plaintiff's original administrative claim was for $1,462.50, but the trial court awarded $20,000.00, notwithstanding the original amount of the claim because there had been additional medical information obtained concerning the plaintiff's condition. The Court finds that in the action at bar evidence presented at trial regarding the

medical condition of Gary Chambers, Jr. showed that numerous circumstances have changed since that date which have demonstrated that his physical and psychological impairment was greater than what was originally anticipated. Under the applicable case law those changed circumstances allow for a full recovery in this case, not limited by the original claim amount.